SHANNON S. PIERCE (Nev. Bar No. 12471)
WADE BEAVERS (Nev. Bar No. 13451)
FENNEMORE CRAIG, P.C.
7800 Rancharrah Parkway
Reno, NV 89511
Tel: (775) 788-2200 / Fax: (775) 788-2283
Email: spierce@fennemorelaw.com; wbeavers@fennemorelaw.com

*Attorneys for Canonical Group Limited*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| RONALD CARPENTER, JR., an individual;<br><br>　　　　Plaintiff,<br><br>vs.<br><br>GORDON DENNY, an individual; PV HOLDING CORP. dba AVIS CAR RENTAL, a foreign corporation; CANONICAL GROUP LIMITED, a foreign corporation; DOES I through V, inclusive and ROE CORPORATIONS II through V, inclusive;<br><br>　　　　Defendants.<br><br>ALLSTATE INSURANCE COMPANY;<br><br>　　　　Intervenor. | CASE NO.:  2:23-CV-00208-RFB-NJK<br><br>**CANONICAL GROUP LIMITED'S MOTION FOR SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED PURSUANT TO LR 78-1**<br><br>**PUBLIC REDACTED VERSION** |

Defendant Canonical Group Limited ("CGL") hereby moves this Court for an order granting summary judgment in favor of Canonical and dismissing all claims asserted by Plaintiff Ronald Carpenter, Jr. ("Plaintiff"). This motion for summary judgment ("Motion") is made pursuant to Fed. R. Civ. P. 56 on the grounds that the claims asserted by Plaintiff fail as a matter of law for the reasons stated herein.  This Motion is based on the following memorandum of points and authorities, the attached affidavits and exhibits, the pleadings and papers on file herein, any oral argument held on this matter, and any other evidence the Court may wish to consider.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

As a clear matter of law, CGL cannot be held liable for the alleged negligence of co-Defendant Gordon Denny where Denny was indisputably (1) not under the control of CGL at the time of the accident at issue, and (2) not engaged in any act within the scope of his employment with CGL at the time of the accident.  The material facts are as follows:  The subject collision occurred around 4:30 a.m. on Saturday, November 30, 2019, when Denny and his passenger—his then-romantic partner Tajé Williams—were returning to Denny's room at the Palms resort after picking up fast food to take back to the hotel.  Denny was employed at the time by CGL as a recruiter of technology personnel, and had flown into Las Vegas from London the afternoon before the accident, which was several days in advance of the start of the Amazon Web Services technology conference (commencing Monday, December 2, 2019), however, Denny believed that, during the weekend before the conference, he (a) was on his "down time" and "personal time" and outside of CGL's control, (b) was outside his normal working days and hours, and (c) had no intention of conducting any recruiting activity.  Among other activities, Denny recalls that he ate dinner with family, shopped, gambled, and attended a Mariah Carey concert over the weekend.  As for the early morning, fast food run on November 30th, there is no evidence that Denny submitted a request for reimbursement of such a meal to CGL as a business expense.

Courts interpreting Nevada law have held clearly that an off-duty employee's car accident will not give rise to liability under respondeat superior where no evidence suggests that the employee was on a special errand that would further the employer's interests or that would otherwise give the employer control over the employee.  *See, e.g., Kornton v. Conrad, Inc.*, 119 Nev. 123, 125, 67 P.3d 316, 317 (2003).  Those are the facts here between CGL and Denny, and summary judgment as to Plaintiff's claim for vicarious liability for Denny's negligence is the required result.

Plaintiff has made virtually no effort to develop its remaining claims for "negligent hiring/training/supervision" or "negligent entrustment" against CGL, and at any rate they fail for the threshold reason that Plaintiff has adduced no evidence that Denny had any driving history or

1   other background to suggest any party should have known he could be a danger to others.

2   Plaintiff has additionally failed to conduct discovery into any facts relating to CGL's training or

3   policies or to produce any facts suggesting CGL actually "entrusted" Denny with a vehicle.

4           Under the facts and circumstances as they exist, CGL can bear no liability for Plaintiff's

5   accident and is entitled to full summary judgment on all claims brought against it.

6   **II.      BRIEF PROCEDURAL BACKGROUND**

7           Plaintiff originally initiated this action in Nevada state court in Clark County[1] on August

8   31, 2020, with the filing of his *Complaint and Demand for Jury Trial* which identified Denny

9   and Avis Car Rental ("Avis")  as the sole named defendants.  On February 16, 2021, Allstate

10  filed a motion to intervene in the State Court Action on grounds that it has a legally protectable

11  interest in the outcome of  the litigation, based on Plaintiff's expressed intent to recover any

12  damages that might exceed Denny's insurance policy limits from Allstate under the terms of

13  Plaintiff's uninsured / underinsured motorist insurance policy.  On March 25, 2021, the State

14  Court granted Allstate's motion to intervene.  *See* ECF No. 1-4.

15          Plaintiff took the deposition of Denny in the State Court Action on October 15, 2021.

16  Present for that deposition were Plaintiff's counsel, Denny's/Avis' counsel, and counsel for

17  Allstate—CGL was not a party to the suit at the time and was not present for the deposition.

18  Following that deposition, Plaintiff filed an amended complaint to name Canonical USA, Inc. as

19  a defendant, alleging that Denny was an employee of Canonical USA, Inc. and acting within the

20  course and scope of his employment at the time of the accident.  *See* ECF no. 1-5 (copy of

21  *Amended Complaint*).  Thereafter, Plaintiff obtained leave to file a Second Amended Complaint

22  which removed Canonical USA, Inc. and instead named CGL as Denny's alleged employer at

23  the time of the accident.  *See* ECF No. 1-2, 1/12/23 *Second Amended Complaint* ("SAC").  CGL

24  thereafter removed this action to this Court on February 9, 2023.  *See* ECF No. 1.

25          CGL took its own deposition of Denny on August 24, 2023, during which it was able to

26  explore issues not addressed during his first deposition and to clarify some of Denny's

27

28          [1] State Court Case Number A-20-820442-C ("State Court Action").

1    statements in his first deposition at which CGL had not been present.  Discovery is now closed

2    and CGL moves for summary judgment on all claims Plaintiff has asserted against it.

3    **III.    CONCISE STATEMENT OF MATERIAL FACTS**

4        **A.  CGL and Terms of Denny's Employment as a "Recruiter"**

5        CGL is a private company limited by shares organized under the laws of the United

6    Kingdom, is headquartered in London, England, and is a subsidiary of Canonical Limited.  CGL

7    is a London-based technology company that specializes in providing commercial support and

8    related services for certain open source computer software.  *See* **Exhibit 1**, Affidavit of

9    Katherine Ollerhead ("Ollerhead Aff."), at ¶2.

10       Gordon Denny was employed by CGL as a "Recruiter" between April 2018 and July 31,

11    2020, with the terms of his employment governed by a Contract of Employment dated March 27,

12    2018.  *See* **Exhibit 2**,[2] Contract of Employment, at § ████████████████.  As set

13    forth in his Contract of Employment, and as he testified at deposition, Denny's responsibility as

14    a Recruiter was to meet and recruit potential new employees to work for CGL and its affiliates.

15    *See id.* at ████████████████; *see also* **Ex. 3**, Denny 8/23/23 Trans. at 18:20-20:13

16    ████████████████████████████████████████████████████

17    ████████████████████████████████████████████████████

18    ████████████████████████████████████████████████████

19    ████████████████████████████████████████████████████

20    ██████████████████████. *Id.*

21       Denny was a salaried employee, and his contract made clear that he was "████████

22    ████████████████████████████████████████████████." *Id.* at §

23    ██.  Denny's contract provided that ██████████████████████████████

24    ████████████████████████████████████████████████████

25    ████████████████████████████████████████████████████

26    ████████████████." *Id.* at ████.  Despite this last clause, Denny acknowledged that he

27    ─────────────

28    [2] *See also* **Exhibit 3**, Relevant Excerpts of Transcript of 8/24/23 Deposition of Gordon
Denny ("Denny 8/24/23 Trans.") at 16:1-6 (authenticating same).

1  █████████████████████████████████████████████████

2  █████████████████████████████████████████████████

3  ████████. **Ex. 3**, Denny 8/24/23 Trans., at 17:11-24 ██████████████

4  █████████████████████████████████████████████████

5  ██████████████████████████.

6        Denny was based at CGL's headquarters office in London, however, from time to time,

7  he traveled as needed for his recruiting work.  *See* **Ex. 2**, Contract of Employment, at §§ ████

8  █████████████████████████████████████████████████

9  ████████████████████████████████.  During his time with CGL, Denny

10  traveled to the U.S. on several occasions for purposes of attending technology industry

11  conferences and events and performing recruiting at those events.  *See* **Ex. 3**, Denny 8/24/23

12  Trans., at 20:21-21:14.  Denny described his work responsibilities at such conferences as

13  follows:

14  ███████████████████████████████████████████

15  ███████████████████████████████████████████

16  ██████████████████████████████

17  ███████████████████████████████████████████

18  █████████.

19  *Id.* at 19:25-20:18.  Denny also testified that he would "do a lot of work on his laptop" when

20  traveling to attend conferences and events, to keep up with his "day-to-day job as well."  *Id.* at

21  22:18-22.  Denny testified that on trips for such conferences he might "meet[] people at the

22  event" or "meet[] them off the event," which could be "prearranged" or he would "meet up [with

23  a potential candidate] after the event at some point."  *Id.* at 22:23-23:14.

24        As to payment and expenses for work-related travel, Denny's contract provided that:

25  ███████████████████████████████████████████

26  ███████████████████████████████████████████

27  ████████████████████████████████████.

28  **Ex. 2**, Contract of Employment, at § ███.  Denny testified that the contract language was

consistent with the way CGL actually administered its travel reimbursement policy during his tenure. *See* **Ex. 3**, Denny 8/24/23 Trans. at 23:15-23. Denny testified that he frequently sought reimbursement for meals and drink while travelling for CGL, and would do so by keeping and photographing his receipts during his trip and uploading them into CGL's "Expensify" software system when he returned to the United Kingdom. *Id.* at 23:24-24:22, 29:10-21. Denny interpreted that the policy disallowed him from seeking reimbursement for a "personal expense" *Id.* at 27:7-17 (Q: "When would an expense not make sense under this policy?" A: "If I went out and bought . . . some clothes or something." Q: "So a personal expense?" A: "Yeah.").

When travelling to attend events for CGL, after receiving approval for the travel from his supervisor, Denny would make arrangements for flight and hotel stay by directly contacting a third party agency, which would search for and return proposed flights and accommodations, which Denny would approve, with billing sent to CGL. *Id.* at 36:4-21 ("They'll find me a flight and then they'll email me the flight details and ask if that's okay and I'll say yes or no and Canonical will pay for it."); 37:22-38:3 (Q: "The travel agency booked the hotel?" A: "We would book it together, flight and hotel."). In planning dates of travel for conferences and events, Denny had some input and would discuss with his supervisor to "try and find out what makes the most sense." *Id.* at 37:3-21.

While traveling to recruiting events, Denny would sometimes engage in personal side trips and leisure time in the location of the conference or event. *See id.* at 88:9-12 (". . . when you are away on a trip you don't - - you know, it's not just confined to the event. You know, there's down time, *personal time*, that you can do that. You can do - - go sightseeing or whatever . . .") (emphasis supplied). Denny understood that, when he out of town on a recruiting trip for CGL, he would have some personal time to himself outside the hours of the event where he was free to do as he wished without obtaining prior permission from CGL. *Id.* at 83:17-84:2 (A: "Canonical haven't ever said that you can't go anywhere. You can only go to your hotel room. If you are going to go to an event you have to go back. They haven't said anything like that." Q: And is that because when you travel you do get some personal time to yourself even though you travelled for Canonical, some of that time that you have you can go pursue your own

personal things without getting Canonical's permission?"  A:  "Yes.").

### B. Denny Spends Time with Family and His Girlfriend During the Weekend Before the Start of the 2019 AWS Conference in Las Vegas

In November 2019, Denny travelled from London to Las Vegas to attend and conduct recruiting for CGL at the AWS re:Invent 2019 conference hosted by Amazon Web Services.  *Id.* at 38:4-39:14.  CGL sent Denny as a recruiter to attend the event because it attracted a high concentration of technology industry professionals that might be good candidates for employment with Canonical.  *Id.* at 39:21-40:22 (Q:  "And the event just attracts a lot of people who might be good candidates to work at Canonical, just a lot of people in the tech industry there that you would  want to talk to as a recruiter?"  A:  "Yeah.  Canonical uses AWS quite heavily or it did, I'm not too sure about it now.  So pretty much anyone in that event would probably be relevant in some capacity to Canonical."); *see also* **Exhibit 4**, Relevant Excerpts of Transcript of 10/15/21 Deposition of Gordon Denny ("Denny 10/15/21 Trans.") at 23:16-22 (A:  "Well, that's how we recruit.  So we'll go to an event to recruit.  So we speak to people at our desk and see if anyone's interested essentially."  Q:  "I understand.  So the recruiting is done at the conference?"  A:  "Yes.").

The conference for which Denny traveled to Las Vegas began on Monday, December 2, 2019 and continued through Friday, December 6, 2019.  **Ex. 3**, Denny 8/24/23 Trans. at 40:23-42:3.   In advance of the conference, Denny flew from London to Las Vegas on Friday, November 29, 2019.  *See* **Ex. 4**, Denny 10/15/21 Trans. at 15:23-16:16:19.  While in Las Vegas, Denny stayed at the Palms resort and casino.  **Ex. 3**, Denny 8/24/23 Trans. at 57:20-25.

Denny testified that his supervisor picked the date of his flight, and that his supervisor "used to always send all the recruiters a few days before just to try to get climatized with the time differences."  **Ex. 3**, Denny 8/24/23 Trans. at 118:9-118:15.  Denny believed it would have been physically difficult on him to have flown in on the Saturday or Sunday before the conference.  *Id.* at 42:4-43:10.  Denny testified that it was important for him as a recruiter to appear well-rested and professional when performing recruiting activities to be a good face for CGL.  *Id.* at 121:18-122:3.

Q:  All right.  So would it have been your practice to get a good night's sleep before you were going to go into a day of work to go out and start recruiting?   Is that part of your preparation for getting ready for a busy day is to get a good night's sleep?

A:  Yeah, it would have been to get a good night's sleep.

Q:  Okay.  Because you don't want to look like you were up at 5:00 in the morning in Vegas while you are out recruiting, correct?

. . .

A:  Well, I wouldn't want to be really, really tired at the conference, no.

*Id.* at 122:4-122:19.

Denny does not recall the exact time he left London on Friday, November 29, but a receipt he submitted for reimbursement to CGL indicates he ate lunch at the London Heathrow airport at approximately 1:49 p.m. local time, showing he boarded his flight to the U.S. thereafter.  *See id.* at 60:2-61:23; *see also* **Exhibit 5**, Expensify Report for Denny Travel, 11/29/19 to 12/9/19 ("Expensify Report")[3] at CGL_00181 (Spuntino Heathrow travel receipt).

Denny testified that he has a number of family members residing in Las Vegas, and recalls that his uncle met him at the airport when he arrived.  *Id.* at 49:18-50:13; 51:21-52:1; 53:12-15.  None of Denny's family members work for Canonical, and he has never recruited any of them to work for Canonical.  *Id.* at 52:17-22.  Denny met his family for dinner the Sunday after he arrived in Las Vegas, before the start of the conference.  *Id.* at 52:5-16.

At the time of his trip to Las Vegas, Denny was "seeing" a woman named Tajé Williams, a real estate agent then living in Austin, Texas.  *See* **Ex. 4**, Denny's 10/15/21 Trans. at 27:13-16; **Ex. 3**, Denny 8/24/23 Trans. at 43:19-44:18; 47:23-48:11 ("We was dating [but] it wasn't a relationship.").  Williams travelled from Texas to Las Vegas to spend time with Denny during his visit, and arrived in Las Vegas on the same day as Denny.  **Ex. 3**, Denny 8/24/23 Trans. at 53:14-21.  Williams did not travel to Las Vegas to attend the AWS conference.  *Id.* at 53:22-54:6 (Q: "She didn't go to the Amazon conference at all, right?"  A:  "No, no.  She went and kind of did her own thing."  Q: "Do you know what she was doing during the day while you were at the

_____
[3] *See* **Ex. 1**, Ollerhead Aff. at ¶5, and **Ex. 3**, Denny 8/24/23 Trans. at 54:14-56:20;  59:4-21authenticating the same.

8

conference?"   A:    "Just going out for meals and, you know, just going out to casinos or something like that.  I mean, I wasn't keeping tabs on that so she could have done anything."). While in Las Vegas, Williams stayed with Denny in the room that he had booked at the Palms casino.  *See id.* at 68:6-9 (A:  "Yeah, she was staying with me.").

During the weekend before the conference, Denny and Williams participated in a number of personal activities, including attending a Mariah Carey concert, going to a spa, and gambling. *Id.* at 81:5-81:20 (Mariah Carey concert) ("It probably was on the weekend . . . it was probably before the conference"); **Ex. 4**, Denny's 10/15/21 Trans. at 24:1-16 (Denny testified that on the Saturday after he arrived in Las Vegas he "was with the young lady [he] was seeing pretty much all day" and that they "went to a spa" and he "got a massage[,] [c]ame back to the hotel. . . spent some time in the hotel[,] [w]ent out[,] . . . went downstairs into the casino area and played some games.").  Denny testified that he and Williams also went shopping together at outlets near the Trump hotel.  **Ex. 3**, Denny 8/24/23 Trans. 80:16-24.

Denny has acknowledged that personal events such as attending the Mariah Carey concert, and otherwise engaging in activities that did not involve meeting with potential recruits, were unrelated to any business purpose:

> Q:  You think you would have been able to buy those tickets for the two of you and expense them for Canonical?  Do you think Canonical would have reimbursed you for those tickets if you bought them?
>
> A:  No.
>
> Q:  Why not?
>
> A:  Because it's not a reasonable expense.
>
> . . .
>
> Q:  Not reasonably related to your work for Canonical?
>
> A:  Well, it's a complete different - - **as I said before, if I was going to invite a client or a candidate then maybe**, but if I was just going to go and enjoy a concert I wouldn't expense it.

*Id.* at 70:12-71:3.  Williams did not work, and had never worked, for Canonical.  *Id.* at 44:7-11. Williams did not have any experience working in the technology sector.  *Id.* at 47:10-13.  While

1   Denny claims to have recruited Williams to work for Canonical "on one occasion" "[p]robably a

2   bit before" the 2019 AWS Conference, his interactions with Williams during the Las Vegas trip

3   in question were unrelated to recruiting (and unrelated to Canonical). *Id.* at 44:19-21; 45:16-21.

4   Indeed, while Denny could not recall details of his prior attempts to potentially recruit Williams,

5   by the time of the Las Vegas trip, he already knew that Williams was deemed to not be a good fit

6   because "she didn't have a [college] degree." *Id.* at 46: 2:13. Denny recalled that CGL had at

7   one point directed him to only recruit people who had college degrees, and that prior to that

8   policy CGL would reject "the vast majority [of candidates] if they didn't have college degrees."

9   *Id.* at 46:14-47:9. Denny agreed that it would not have been "common" for him to recruit people

10   with whom he was in a romantic relationship (as he was with Williams) and that—in fact—he

11   had never otherwise recruited someone with whom he was romantically involved. *Id.* at 48:7-22.

12   ### C. Denny Becomes Involved in a Vehicular Accident While Returning to his Hotel

13   ### with Williams After Picking Up "Fast Food"

14   The night of Denny's arrival in Las Vegas (Friday, November 29 – three days before his

15   recruiting work for Canonical was scheduled to begin), he recalls that he picked up a rental car

16   (possibly at the airport) and at some point met Williams at the Palms. **Ex. 3**, Denny 8/24/23

17   Trans. at 74:14-75:3; 75:8-11 (Q: "Do you remember if you met her at the hotel or somewhere

18   else?" A: "No. I think she got an Uber to the hotel."). Denny recalls that at some point after his

19   arrival (and before the subject accident), he did some gambling. *See id.* at 95:4-96:10. A receipt

20   that Denny later submitted for reimbursement to CGL indicates that, between midnight and 1:12

21   a.m. on Saturday, November 30, he and another individual ate at the Joyful House restaurant on

22   Spring Mountain Road in Las Vegas. *See* **Ex. 5**, Expensify Report, at CGL_000182 ("Joyful

23   House Receipt").[4] Denny testified that he likely ate that meal with Williams. *See* **Ex. 3**, 8/24/23

24   Trans at 74:9-13. Denny has no recollection of what he and Williams discussed during their date

25   at the Chinese restaurant. *Id.* at 76:17-22.

26   More than three hours after leaving Joyful House, at around <u>4:30 a.m. on Saturday,</u>

27

28   [4] *See also* **Ex. 3**, 8/24/23 Trans. at 73:6-14 (authenticating same).

November 30, as Denny was driving his rented car with Williams as a passenger through the intersection of Flamingo Road and the off ramp to Interstate 15, Denny's vehicle collided with a vehicle driven by Plaintiff Ronald Carpenter. *See, e.g.,* **Exhibit 6**, Accident Incident Report; *see also* **Ex. 3**, 8/24/23 Trans at 63:1-64:5 (accident occurred at 4:30 a.m. on 11/30/19).

Denny does not have good recollection of all of his and Williams' activities between the time he landed in Las Vegas and through the night of the 29th to the collision early in the morning of the 30th. However, he does recall that, just prior to the accident, he and Williams had left the Palms for the purpose of picking up some "fast food" to "take [back] to the hotel." **Ex. 4**, Denny's 10/15/21 Trans. at 27:2-13; *see also* **Ex. 3**, 8/24/23 Trans. at 64:18-65:24. The food was in the car with him and Williams at the time of the accident. **Ex. 4**, Denny's 10/15/21 Trans. at 29:9-19.

Other than the receipt from Heathrow airport and the receipt from Joyful House, Denny did not submit any other expenses for reimbursement from November 29 or November 30. *See, e.g.,* **Ex. 5**, Expensify Report, *passim*. Importantly, Denny did not submit to CGL, as a business expense, a receipt for the fast food he and his girlfriend were retrieving for themselves at the time of the subject accident.

Following the accident, Denny did attend the AWS conference that commenced on Monday, December 2. Denny confirmed during his deposition that he viewed the AWS conference as the "work aspect" of his trip to Las Vegas, and that **he had no intention of performing any recruiting activities during the Saturday or Sunday before the conference**:

> Q: . . . We talked about Friday you fly in, you are in late, get dinner and Chinese food, go back to the hotel, go back and get some fast food, get in this accident at 4:30 in the morning, on Saturday, early Saturday morning. Did you have an intention when you were having this date night with Ms. Williams of doing any recruiting the next day?
>
> . . .
>
> A: Did I have any intention of doing recruitment. This is Sunday; right?
>
> Q: **This would have just been Saturday, it was early morning Saturday. But Saturday or Sunday, were you planning on doing any recruiting activities on any of those days?**
>
> A: **No, I wouldn't say I was planning anything per se**.

**Ex. 3**, 8/24/23 Trans. at 122:20-123:15 (emphasis added).

Denny further explained during his deposition that he viewed his activities with Williams between November 29 and November 30 as part of his "down time" or "personal time," and that he did not feel he needed CGL's "permission" to engage in those activities:

Q:  . . . if we could just refine it a little bit more, not everything you did in Las Vegas was for Canonical because you did some things that were personal for you that  you didn't ask for Canonical's permission for; correct?

. . .

A:  Yeah.  I mean, I guess so.  There wasn't - - -like with - -  **when you are away on a trip you don't - - you know, it's not just confined to the event.  You know, there's down time, personal time, that you can do that**.  You can do - - go sightseeing or whatever, but I was in Vegas because I was with Canonical.

Q:  But we talked about that.  **There was some of that down time.  You weren't on call 24/7, you did do some things personal for you without getting Canonical's permission.  We talked about a few things, right?**

A:  **Yes.**

Q:  "Okay.  Did you do any sight-seeing?"

A:  I mean, we saw some of the hotels and stuff, yeah.  I mean, I was on the Strip quite a bit anyway because of the event.  So after the event sometimes I walked down the Strip and look at some of the hotels.

*Id.* at 87:19-88:24 (emphasis added); *see also, e.g., id.* at 84:14-19 (Q:  And as we talked about, it's kind of expected that you can spend some personal time.  If you have down time, you are permitted to do that without Canonical's permission?"  A:  "Yeah, I'm not restricted on where I go.").

When prompted at his deposition to explain any "benefit" that he saw for CGL in his various activities during the night of November 29 to November 30, Denny explained that the only "benefit" he could see was that he needed to eat meals to sustain him during his travel to attend the conference.

Q:  Can you think of any way that you going to the Mariah Carey concert benefitted Canonical?

A:  No.

Q:  Can you think of any way that you and Ms. Williams going shopping at the outlets by the Trump Tower, did that shopping that you guys were doing benefit

Canonical in any way?

A:  No.

Q:  To the extent you were going out to get fast food from the hotel before the accident, would that have benefitted Canonical in any way?

. . .

A:  **Well, they have a - - I wouldn't say it benefits them per se**, but in that they tell you you are able to go out and get some food.  So that was - - yeah, I mean, that's their policy you can go and get food.  I mean, if they didn't feed me when I was over there, I probably wouldn't have been over there.

Q:  **Okay.  Is there any way other than getting food that benefits Canonical?**

A:  **Not that I know of, no.**

*Id.* at 89:5-90:9.

IV.    **LEGAL ARGUMENT**

A.    **Summary Judgment Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a "material fact" is one "that might affect the outcome of the suit.  Summary judgment is not a "disfavored procedural shortcut," but rather, is an "integral part of the Federal Rules as a whole.")  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  "Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is 'no genuine issue for trial'" and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the moving party presents evidence that would call for judgment as a matter of law, the opposing party must show by specific facts the existence of a genuine issue for trial.  *Anderson*, 477 U.S. at 250; Fed. R. Civ. P. 56(e).  To demonstrate a genuine issue of material fact, the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus.*, 475 U.S. at 586.  Conclusory allegations that are unsupported by evidence are insufficient to overcome a motion for summary judgment.  *Taylor v. List*, 880 F. 2d 1040, 1045 (9th Cir. 1989); *California Architectural Bldg. Products, Inc. v.*

1  *Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (summary judgment warranted

2  where nonmoving party bears the burden of proof with respect to an essential element of the case but

3  fails to establish a genuine dispute of fact with respect to the existence of that element.

4          **B.    CGL Cannot be Liable for the Accident Based on the Undisputed Facts**

5          Plaintiff's Second Amended Complaint asserts three "causes of action" entitled

6  "Negligence / Negligence Per Se," "Negligent Entrustment," and "Negligent Hiring, Training,

7  Supervision, Retention and Policies/Procedures, Respondeat Superior."  Only the third cause of

8  action is expressly directed at CGL, however, as set forth herein, no cause of action expressly or

9  impliedly alleged against CGL in the SAC can succeed as a matter of law, and CGL is entitled to

10  complete summary judgment in its favor on all claims.

11          **1.  "Respondeat Superior" is Not a Cause of Action**

12          Plaintiff's third cause of action includes in its title "Respondeat Superior" and includes a

13  bald allegation that the other defendants were "acting within the course and scope of their

14  employment, services, or agency" CGL "when the subject incident occurred and acted

15  negligently," and that CGL is "vicariously liable for the injuries sustained by Plaintiff as alleged

16  herein."  ECF No. 1-2, SAC, at ¶36.  "Respondeat superior" is a theory of liability, not an

17  independent cause of action  Accordingly, to the extent Plaintiff seeks to recover against CGL

18  for a claim of "[r]espondeat superior," such claim fails as a matter of law and CGL is entitled to

19  summary judgment.  *See Okeke v. Biomat USA, Inc.*, 927 F.Supp.2d 1021, 1028 (D. Nev. 2013).

20          **2.  CGL is not Vicariously Liable for Denny's Alleged Negligence**

21          CGL interprets from the SAC that Plaintiff seeks to impose vicarious liability on CGL for

22  Denny's alleged "negligence" or "negligence per se" in connection with the subject accident.

23  Without conceding in any way the validity of Plaintiff's claims against Denny, the facts and

24  circumstances of this case demonstrate that CGL cannot be held liable for Denny's conduct at

25  the time of the accident under respondeat superior.

26          Respondeat superior liability attaches under Nevada law <u>only</u> where (1) the employee is

27  under the control of the employer and (2) when the alleged tortious act is within the scope of

28  employment.  *Molino v. Asher*, 96 Nev. 814, 817, 618 P.2d 878, 879 (1980).  While the question

of whether an employee is acting within the scope of his or her employment is generally a question for the trier of fact, "where undisputed evidence exists concerning the employee's status at the time of the tortious act, the issue may be resolved as a matter of law." *Rockwell v. Sun Harbor Budget Suites*, 112 Nev. 1217, 1225, 925 P.2d 1175, 1180 (1996). As Denny was neither within CGL's "control" at the time of the subject accident, nor was he engaged in an activity "within the scope" of his employment, CGL cannot be liable under respondeat superior.

Nevada recognizes the "going and coming" rule whereby "[t]he tortious conduct of an employee in transit to or from the place of employment will not expose the employer to liability, unless there is a special errand which requires driving." *Molino*, 96 Nev. at 817, 618 P.2d at 879-80 (citing *National Convenience Stores v. Fantauzzi*, 94 Nev. 655, 659, 584 P.2d 689, 692 (1978)). The "special errand" exception to the going and coming rule provides that an employee who is driving "not during usual working hours" but who is in transit to accomplish a "task reasonably within the scope of his employment and of benefit to his master," rather than a "personal objective," may be deemed to be acting within the scope of his employment. *National Convenience Stores, Inc.*, 94 Nev. at 658-659, 584 P.2d at 691-692. Nevada courts have held that an off-duty employee's car accident will not give rise to liability under respondeat superior where no evidence suggests that the employee was on a special errand that would further the employer's interests or that would otherwise give the employer control over the employee. *See, e.g., Kornton v. Conrad, Inc.*, 119 Nev. 123, 125, 67 P.3d 316, 317 (2003).

> ### a.    *Denny was not under CGl's control at the time of the accident*

For purposes of evaluating "control," the employee must be under the employer's control "at the time of the accident in question." *See Molino*, 618 P.2d at 880 ("[T]he record is devoid of any evidence to show that either party was within the course of employment and under the control of [employer] at the time of the accident in question."); *see also, e.g., Carnes v. Phoenix Newspapers, Inc.*, 227 Ariz. 32, 35, 251 P.3d 411, 414 (Ariz. Ct. App. 20110) (Arizona law) ("[T]he employee generally must be subject to the employer's control or right of control *at the time of the accident*.") (emphasis in original).

Here, it is undisputed that Denny was not engaged in recruiting work for CGL at—or

even around—the time of the accident, and that CGL had no "control" of any kind over his activities from the time he arrived in Las Vegas on Friday night through the beginning of the AWS Conference the following Monday.  To the contrary, Denny understood that this was his "down time" and "personal time" during the weekend before the conference, and stressed that he did not need CGL's "permission" to do anything, nor was he "restricted" by CGL in any way as to where he could go or what he could do.  *See* **Ex. 3**, Denny 8/24/23 Trans. At 88:6-12 (*Id.* at 83:17-84:2 (providing he did not need permission to go on personal excursions outside the timing of the event); *see also id. at.* 84:14-19 (Q:  "And as we talked about, it's kind of expected that you can spend some personal time.  If you have down time, you are permitted to do that without Canonical's permission?"  A:  "Yeah, I'm not restricted on where I go.").

This was consistent with Denny's usual work experience at CGL where he would not work on weekends, only worked "usual working hours" between 9:00 a.m. and 6:00 p.m., and was generally not "on call" for his employer outside of usual working hours.  *Id.* at 17:11-24.  As Denny confirmed in his first deposition, the recruiting work he had travelled to conduct for CGL was generally "done at the conference" (*id.* at 23:16-22), and while he might sometimes arrange to "meet up" with a potential recruit outside the conference, he confirmed clearly that he was not planning on doing any recruiting the Saturday or Sunday before the conference began.  *Id.* at 122:20-123:15.

Denny's activity here falls short of establishing employer "control" under the existing precedent in Nevada.  *See, e.g., Molino*, 618 P.2d at 817-818 (an employee was found not to be in the employer's control even while walking from her parked vehicle in her employer's parking lot); *see also, e.g., Kornton*, 119 Nev. at 124-125 (employee not in employer's control even while driving to a job site, under the going and coming rule); *see also, e.g., Savicic v. Eighth Jud. Dist. Ct*., 124 Nev. 1506, 238 P.3d 852, 2008 WL 6113497, at *2 (Nev. 2008) (unpublished) (employee would not be in the course and scope of employment even if driving co-workers home after work hours); *cf. Evans v. Southwest Gas Corp.*, 108 Nev. 1002, 842 P.2d 719 (1992) (overruled on other grounds by *GES, Inc. v. Corbitt*, 117 Nev. 265, 21 P.3d 11 (2001)) (employee who was on call at all times for gas company emergencies was within employer's

1    control when driving company truck at time of accident).

2         The facts of this case are in fact highly similar to the facts examined by the Arizona

3    Court of Appeals in the case of *Engler v. Gulf Interstate Eng'g, Inc.*, utilizing common law

4    principles of respondeat superior and holding that an employer was not vicariously liable for its

5    employee's alleged negligence in an accident that occurred while the employee was travelling

6    back to his hotel following dinner after completion of a workday, even where the employee was

7    working out of state for a period of time and staying in a hotel and driving a vehicle expensed to

8    his employer.  227 Ariz. 486, 258 P.3d 304 (Ariz. Ct. App. 2011), *aff'd*, 230 Ariz. 55, 280 P.3d

9    599 (2012).  The Arizona appeals court assessed the facts as follows:

> At the time of the accident, Gray was not subject to Gulf's control or right of
> control.  Instead, once he returned to his hotel in Yuma, Gray was free to do what
> he wished until the next day when he arrived at work, and during that time, Gulf
> did not control or attempt to control his actions in any way, **including directing
> him where or when to eat**, and whether, how, or when to leave or return to his
> hotel room.  Additionally, at the time of his allegedly negligent conduct, Gray was
> not acting in furtherance of his employer's business by engaging in the kind of
> work he was employed to perform, and his need to eat dinner, whether at the hotel
> or at a restaurant, was no more incidental to his employment than his need to eat
> dinner while not on an out-of-town assignment.  Gray's conduct did not occur
> within the authorized time and space limits of his work (it occurred after his work
> day had ended), and **other than reimbursement of expenses, Gulf did not pay
> Gray for any post-work activity. . . . Accordingly, Grau's conduct at the time of
> the accident was not so closely connected in time, place, and causation to his
> employment as to be a risk of harm fairly attributable to his employer's
> business, as compared with conduct purely personal in nature**.

19   *Engler*, 227 Ariz. At 495, 258 P.3d at 313 (emphasis supplied).

20        Importantly, as confirmed by the court in *Engler* and recognized in other jurisdictions, an

21   employee is not per se in the control of his employer (or acting in the scope of his employment)

22   simply because he is driving a rental vehicle that has been expensed to his employer.  *See, e.g.,*

23   Restatement (Second) Agency § 229 comment d ("If the master supplies a servant with a vehicle

24   in order that the servant may go to or from work, it is important to ascertain whether the vehicle

25   is supplied primarily for the purpose of assisting the master's work or for the purpose of assisting

26   the employee to perform what is essentially his own job of getting to or from work."); *see also,*

27   *e.g., Heide v. T.C.I., Inc.*, 264 Or. 535, 506 P.2d 486 (1973) (Oregon law) (notwithstanding

28   employee who had been supplied with vehicle by employer, with mileage allowance for use of

1    the car in business, she was not in course and scope of employment where she left work, went to

2    a bar with a customer, then left the customer to travel home and was involved in accident).   Here

3    there are no facts or evidence that CGL covered the expense for Denny to rent a car for any

4    purpose other than to convey himself to and from the location where his work was to occur,

5    namely, the conference – and to conduct other recruiting activities—activities he was

6    indisputably not conducting while driving at 4:30 a.m. on November 30.

7        Based on these undisputed facts and circumstances of Denny's conduct and activities at

8    the time of the accident, no trier of fact could find that Denny was within CGL's "control" for

9    purposes of the respondeat superior analysis.   Accordingly, CGL cannot be held vicariously

10   liable for Denny's alleged negligence.

11           **b.    *Denny was not conducting activity within the scope of his employment***
                     ***with CGL at the time of the accident***

12

13       In general, "[a]n employee's act is not within the scope of employment when it occurs

14   within an independent course of conduct not intended by the employee to serve any purpose of

15   the employer."   Restatement (Third) of Agency § 7.07(2) (2006).   The scope-of-employment

16   inquiry restricts employer liability to conduct that "should be considered as one of the normal

17   risks to be borne by the business."   Restatement (Second) of Agency § 229 comment a (1958);

18   *see also Candow v. Dust*, No. 2:11-cv-00343, 2014 WL 4636372 at *4 (D. Nev. Sep. 16, 2014).

19   "In this way, the provision aims at the causal connection between a business's activities and the

20   harm caused."   *Candow*, 2014 WL 4636372 at *4 (citing W. Seavey, *Handbook of the Law of*

21   *Agency* 148 (1964)).

22       Courts applying the traditional rule for respondeat superior in other jurisdictions have

23   analyzed whether the employee's conduct at the time of the tort "is the kind the employee is

24   employed to perform, . . . occurs within the authorized time and space limits, and furthers the

25   employer's business."   *Baker ex rel. Hall Brake Supply, Inc. v. Stewart Title & Trust of Phoenix,*

26   *Inc.*, 197 Ariz. 535, 540, 5 P.3d 249 (Ariz. Ct. App. 2000) (Arizona law); *see also Thorn v. City*

27   *of Glendale,* 28 Cal.App.4th 1379, 1382 (Cal. Ct. App. 2d 1994) (California law).   "That the

28   employment brought tortfeasor and victim together in time and place is not enough."   *Lisa M. v.*

1   *Henry Mayo Newhall Memorial Hosp.*, 12 Cal. 4th 291, 298, 907 P.2d 358 (Cal. 1995).

2          Here, the precise act that Denny was performing at the time of the accident—returning to

3   his hotel room with Williams with fast food at 4:30 a.m.—undisputably (1) was outside his

4   normal working hours, (2) was unrelated to his normal duties for CGL, and (3) conferred no

5   meaningful benefit on CGL.  As stated, Denny had no plans to perform any recruiting work over

6   the weekend before the conference, and spent the evening after landing in Las Vegas gambling

7   and having a late dinner date with Williams at a Chinese restaurant.  When asked to explain any

8   benefit CGL might have realized from his subsequent fast food trip in the early morning hours,

9   Denny agreed that he "wouldn't say it benefits them per se" but that he believed CGL had an

10  obligation to "feed [him] when [he] was over there."  **Ex. 3**, Denny 8/24/23 Trans. at 89:5-90:9.

11  He could think of no other potential "benefit."  *Id.*  Again, there is no evidence that Denny

12  submitted a request for reimbursement for a "fast food" meal  purchased before the accident, and

13  according to established case law, eating is not close enough to Denny's job duties to fall within

14  the requirement that he be acting within the course and scope of his employment.

15         Rather than conferring any benefit, it is clear that Denny's early morning sojourn for fast

16  food with Williams was wholly inconsistent with Denny's adequate performance of his duties,

17  and inconsistent with the reason Denny claims he was sent to Las Vegas days early before the

18  conference (to "rest," not to make a middle-of-the-night run for fastfood with his girlfriend after

19  gambling and taking in the local nightlife).  Denny expressly agreed that, as a recruiter, it would

20  be important for him to "get a good night's sleep" and that an all-night Las Vegas personal

21  adventure would be contrary to his practice of performing or getting prepared to work.  *Id.* at

22  122:4-19 (Q: "Because you don't want to look like you were up at 5:00 in the morning in Vegas

23  while you are out recruiting, correct?"  A:  "Well, I wouldn't want to be really, really tired at the

24  conference, no.").

25         Because he was not going to or coming from any activity within the scope of his

26  recruiting duties or that otherwise might confer come benefit on CGL, it cannot be argued that

27  Denny's fast food trip was a "special errand" falling within the exception to the "going and

28  coming rule."  Rather, Denny was driving for purposes of accomplishing a personal task for his

1    own benefit.  Vicarious liability therefore cannot attach to CGL for his alleged negligent driving.

2         It is clear that none of Denny's other activities during the weekend before the

3    conference—which he characterized as his "down time" and "personal time"—were related to

4    his recruiting work or in the scope of his employment, including his date to a Mariah Carey

5    concert, massages, shopping, and gambling with Williams, or his visit with his uncle at the

6    airport and visit with his family Sunday night.  However, even assuming, *arguendo*, that some

7    part of Denny's weekend in Las Vegas before the conference was conducted for the benefit of

8    and within the scope of his employment with CGL—whether to rest or adjust to the time change,

9    or otherwise—his 4:30 a.m. travel to pick up fast food was a clear departure from such task for

10   solely personal purposes, referred to as a "frolic" in traditional common law.  *See, e.g., Candow*,

11   2014 WL 4636372, at *4 (citing *Pyne v. Witmer*, 129 Ill.2d 351 (1989) (if an employee commits

12   a tort while engaging in a "'frolic,' or the pursuit of his own business unrelated to any business

13   of his employer, his employer is not liable.").  Again, CGL would have had no interest

14   whatsoever in Denny making a late-night run for fast food—which Denny admits would render

15   him too tired to adequately perform recruiting duties.  Moreover, Denny had already eaten (and

16   expensed) a Chinese dinner to CGL three hours earlier.  Thus, to the extent that eating a meal for

17   purposes of sustenance could be sufficieintly within the course and scope of employment to

18   trigger respondeat superior liability, that meal, expensed by Denny as a business expense,

19   occurred outside of the late-night trip in which the accident occurred.  Indeed, the absence of any

20   submitted expense reimbursement for a fast food meal just prior to the accident further

21   demonstrates that Denny was on the road for personal reasons, unrelated to the needs of his

22   employer.

23        Based on these undisputed facts and circumstances of Denny's conduct and activities at

24   the time of the accident, no trier of fact could find Denny was engaged in activities within the

25   "scope of his employment" for purposes of the respondeat superior analysis, and vicarious

26   liability cannot be imputed to CGL.

27              ***c.    Plaintiff's Effort (Before CGL Entered the Case) to Elicit Legal
                 Conclusions from Denny Regarding the "Course and Scope" of His
28               Employment Cannot Create a Dispute of Fact***

Plaintiff took Denny's deposition in October of 2021—prior to CGL (or any Canonical-affiliated entity) being added to and served with notice of the suit.  *See, e.g.,* ECF No. 1 (Notice of Removal) at 6 (Plaintiff's SAC was filed January 12, 2023 and CGL served January 17, 2023); and at ECF No. 1-2 (Plaintiff's SAC).  As such, CGL was not present at Denny's first deposition and had no opportunity to object to lines of questioning that may have related to its interests in this suit, including leading questions from Plaintiff's counsel baldly designed to elicit some type of legal admission from Denny that he was in the "course and scope of his employment" at all relevant times:

> Q:  When the collision occurred, were you within the course and scope of your employment with Canonical?
>
> [Mr. Molina, Denny's counsel]:[5]  Objection.  Vague and ambiguous.  Calls for a legal conclusion.
>
> A:  Can you clarify that question, please?

Despite Denny's clear indication that he did not understand the term, Plaintiff's counsel later renewed the same question to elicit the desired response:

> Q:  Okay.  Do you know what within the course and scope of your employment means?
>
> A:  The course and scope of my employment?
>
> Q:  Yeah.  In other words, everything you were doing here in Las Vegas was on behalf of Canonical, correct?
>
> A:  Yes.

**Ex. 4**, Transcript of 10/15/21 at 17:9-15, .

At his subsequent deposition taken by CGL, Denny clarified that he has no legal training or education of any kind.  **Ex. 3**, Denny 8/24/23 Trans. at 13:3-9.  When given the opportunity to clarify the responses he had given Plaintiff's counsel in his prior deposition, Denny testified that he was completely unfamiliar with the legal terminology Plaintiff's counsel had proffered to him, and clarified that, in fact, there was "down time" and "personal time" outside the event during

---

[5] It is notable that Denny's counsel objected to the first iteration of this question—correctly—as being vague and ambiguous, and calling for a legal conclusion, and Denny also confirmed that he did not understand it.

his visit to Las Vegas where he was free to sightsee or otherwise entertain himself:

[QUOTING FROM Denny 10/15/21 Trans. at 33:10-23]

. . .

Q: I think we talked about how you are not a lawyer, you are not a barrister, you are not an attorney. You testified that you don't have any legal training . . . Do you have a lot of familiarity with legal terms and their use in civil litigation in the United States?

A: No, obviously not.

. . .

Q: So when [Plaintiff's counsel] used the term course and scope of your employment and you asked course and scope of my employment, was that a phrase that you had heard before and had a lot of familiarity with?

A: I wouldn't say I heard it before, no.

. . .

Q: But I think as we talked about, if we could just refine it a little bit more, not everything you did in Las Vegas was for Canonical because you did some things that were personal for you that you didn't ask for Canonical's permission for; correct?

. . .

A: Yeah. I mean, I guess so. There wasn't - - like with - - when you are away on a trip you don't - - you know, it's not just confined to the event. You know, there's down time, personal time, that you can do that. You can do - - go sight-seeing or whatever, but I was in Vegas because I was with Canonical.

**Ex. 3**, Denny 8/24/23 Trans. at 85:1-88:24.

This clarification from Denny is helpful to understand that he did not intend to testify at all to the relevant elements of respondeat superior liability. Even without such clarification, Denny's responses to Plaintiff's line of questioning during his first deposition are immaterial to the present motion. At the very most they could be construed as lay legal conclusions that are inadmissible as a matter of law, and that cannot be considered on summary judgment. *See, e.g., Chiate v. Morris*, 972 F.2d 1337, at *6 (9th Cir. 1992) (unpublished) ("Although a lay witness may give an opinion on an ultimate issue to be decided by the trier of fact . . . she may not offer legal conclusions) (collecting cases); *see also MVU Investors, LLC v. General Electric Company*, 417 Fed.Appx. 696 (9th Cir. 2011) ("We conclude that the mere subjective legal opinion by the

MVU chairman is not enough, on its own, to create a *genuine* issue of material fact. . . . Indeed, our court's case law is clear that deposition testimony not within the deponent's personal knowledge, consisting of summary legal conclusions, does not create a genuine factual dispute.") (emphasis in original) (citing *Villarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir 2002).

Plaintiff attempted a similar tact later in the case by serving on March 23, 2023, written requests for admission on Denny directly which commanded admission of similar broadly-phrased legal conclusions.  As CGL was then involved in the suit and able to object, it did so, serving objections to Plaintiff's written requests to Denny and noting that (among other things) the requests were improper in seeking to compel legal conclusions and glib admissions regarding disputed ultimate legal issues in the case.  *See* **Exhibit 7**, CGL's 4/21/23 Objections to Plaintiff's Second Set of Requests for Admissions to Gordon Denny; *see also, e.g., Sommerfield v. City of Chicago*, 251 F.R.D. 353, 355 (N.D. Ill. 2008) ("Requests to admit may not be used to establish legal conclusions.") (citing 7 Moore's Federal Practice § 36.10[8] (3rd Ed. 2006); *see also People of State of Cal. v. The Jules Fribourg*, 19 F.R.D. 432, 436 (N.D. Cal. 1955) (". . . there is general agreement that requests for admission are not to be treated as substitutes for discovery processes to uncover evidence, and that they may not be applied to controverted legal issues lying at the heart of the case.  Their purpose is to eliminate from the trial matters as to which there is no genuine dispute.").

For the reasons stated, Plaintiff's self-serving efforts to circumvent CGL and obtain binding legal admissions from Denny regarding the applicability of respondeat superior in this case, and Denny's uninformed responses to the same, are of no material weight to this Court in considering summary judgment and should be disregard entirely.

### 3.    There is No Evidence to Support a Claim Against CGL for "Negligent Hiring, Training, Supervision, Retention, and Policies/Procedures"

Plaintiff's vague and broad allegations of negligent hiring and training practices with respect to its "drivers" is utterly unsupported by evidence in the record and fails as a matter of law.  To prove such a claim, Plaintiff must prove by a preponderance of the evidence: (1) a duty

of care owed by defendant to the plaintiff; (2) breach by the defendant of that duty by hiring, retaining, and/or supervising an employee even though defendant knew, or should have known, of the employee's dangerous propensities; (3) the breach was the cause of plaintiff's injuries; and (4) damages. *Peterson v. Miranda*, 991 F.Supp.2d 1109, 1118 (D. Nev. 2014), *on reconsideration in part*, 57 F. Supp. 3d 1271 (D. Nev. 2014) (citing *Hall v. SSF, Inc.*, 112 Nev. 1384, 930 P.2d 94, 99 (1996)).  "Claims for negligent training and supervision are based upon the premise that an employer should be liable when it places an employee, who it knows or should have known behaves wrongfully, in a position in which the employee can harm someone else." *Okeke*, 927 F.Supp.2d at 1028.

As a threshold matter, there is no evidence in the record whatsoever that Denny ever exhibited any "dangerous propensity" of which CGL knew or should have been aware, which is an essential element of this claim.  Plaintiff has not sought any discovery regarding CGL's hiring practices or background checks on prospective employees, or regarding its training for recruiters. Moreover, Plaintiff has not produced any witness testimony or other evidence to articulate the scope of CGL's alleged duties in hiring and training "recruiters"—Denny's specific job function—or to explain how Denny's fitness for his work as a recruiter relates in any causal way to the accident and Plaintiff's alleged injuries.

Even assuming (without conceding) some general duty of CGL to not hire Denny (or to supervise him differently) if he were a dangerous driver, there is nothing whatsoever in the record casting doubt on Denny's driving abilities or otherwise relating to his alleged lack of fitness for the activities that might be incidental to travel.  Denny testified that he first obtained his drivers' license in the United Kingdom in or around September 2010, and it had never been suspended or revoked.  **Ex. 4**, Transcript of 10/15/21 at 12:7-13.  A police officer responding to the scene of the accident confirmed Denny presented a valid United Kingdom drivers' license. **Exhibit 8**, Relevant Excerpts of Transcript of Deposition of Trooper Christopher Black at 29:22-30:10.  Other than the subject accident, Denny testified he had only ever been involved in a single other car accident, in December 2018, in Austin, Texas (after he had already been hired by CGL), and he was not at fault or issued any citation.  **Ex. 4**, Transcript of 10/15/21 Deposition of

1    Gordon Denny at 12:22-13:25.

2          It is well-settled that "[t]he fact that an employee acts wrongfully does not in and of itself

3    give rise to a claim for negligent hiring, training, or supervision." *Colquhoun v. BHC Montevista*

4    *Hospital, Inc.*, No. 2:10-c-00144, 2010 WL 2346607 (D. Nev. June 9, 2010); *see also, e.g.*

5    *Muhammad v. Skolvsvold*, 2021 WL 4941636 (D. Nev. Oct. 22, 2021) (dismissing complaint

6    alleging negligent hiring, training, retention, and supervision of rideshare driver, on grounds that

7    plaintiff had "not alleged any facts that make it plausible that [defendant] knew or should have

8    known of [employee's] alleged dangerous propensities before or after it hired him . . .[i]nstead,

9    he presents only conclusory allegations combined with the fact that [employee] allegedly caused

10   the accident."). Plaintiff indisputably bears the burden of proof in a negligence case, and cannot

11   prevail without making a showing sufficient to establish each of the essential elements of his

12   claims. *Copper Sands Homeowners Ass'n, Inc. v. Copper Sands Realty, LLC*, No. 2:10-cv-

13   00510, 2013 WL 3270430, at *5-6 (D. Nev. June 26, 2013) (granting summary judgment on

14   claim for negligent hiring, training, and supervision where plaintiffs "faile[d] to provide

15   evidence of Defendants' hiring practices," "set forth no evidence indicating that Defendants

16   failed to conduct a background search on [the employee] that would have revealed an alleged

17   propensity," and "lack[ed] sufficient evidence to create a genuine issue of material fact as to

18   whether Defendants knew or should have known that [employee] would act in this allegedly

19   negligent manner."). Here, there is an absence of evidence to support Plaintiff's claim, and

20   summary judgment is appropriate.

21          **4.  CGL Cannot be Liable for "Negligent Entrustment" Under the**

22              **Undisputed Facts**

23          To succeed on a claim for "negligent entrustment," Plaintiff would have to prove by a

24   preponderance of the evidence that CGL somehow entrusted a vehicle to "an inexperienced or

25   incompetent person." *See, e.g., Zugel v. Miller*, 100 Nev. 525, 688 P.2d 310, 312 (1984). As set

26   forth above with respect to the "negligent hiring" claim, the record is devoid of any evidence to

27   suggest that Denny was "inexperienced" or "incompetent" to operate a vehicle. To the contrary,

28   he had had a valid UK drivers license since 2010, with a single accident in his history, for which

1    he was not at fault. Plaintiff's claim for "negligent entrustment"—to the extent it is directed at

2    CGL—fails as there is no evidence in the record to support this essential element.

3            There is also no evidence in the record supporting the remaining elements of this claim as

4    it relates to CGL, including that CGL affirmatively "entrusted" any vehicle to Denny by simply

5    covering the cost of the rental as placed by the third party travel agency. The theory of negligent

6    entrustment only applies "where one who has the right to control the car permits another to use it

7    in circumstances where he knows or should know that such use may create an unreasonable risk

8    of harm to others." *See Goggin v. Enter. Leasing Co.-W., LLC*, 324 F. Supp. 3d 1179, 1182 (D.

9    Nev. 2018); *Connell v. Carl's Air Conditioning*, 97 Nev. 436, 440, 634 P.2d 673 (1981). To

10    establish a prima facie case of negligent entrustment in Nevada, a plaintiff must show two key

11    elements: (1) that an entrustment occurred, and (2) that the entrustment was negligent. *Garcia v.*

12    *Awerbach*, 136 Nev. 229, 232 (2020).

13            The facts and Plaintiff's own allegation are that Denny rented the vehicle he was driving

14    at the time of the accident "from Avis." ECF No. 1-2, SAC at ¶10. Denny testified that he made

15    his travel arrangements through a third party agency, in consultation directly with the agency.

16    *See* **Ex. 3**, Denny 8/24/23 Trans. 36:4-37:2. There is no evidence in the record to suggest that

17    CGL directly booked the rental car on Denny's behalf, or that it specifically instructed Denny to

18    obtain a rental car as opposed to other available modes of transportation. An essential element of

19    any claim for "negligent entrustment" is that the defendant "entrust' or "place" a vehicle with

20    another, and also that it have "control" of the vehicle, and even where a defendant provides

21    financing for the vehicle this is insufficient to prevail. *See Connell*, 97 Nev. at 440 ("There was

22    no showing that [employer] had any control over the vehicle or did any more than facilitate its

23    financing. The doctrine of negligent entrustment does not extend to one who neither entrusts nor

24    places a vehicle with another . . . or to one who has no right to control the vehicle.") (citations

25    omitted); *see also, e.g., Negri v. Murphy*, 2017 WL 1434240, at *2 (Ct. Sup. Ct. Apr. 3, 2017)

26    ("While [the employer] unquestionably took steps to make rental vehicles more accessible to its

27    employees, they played no part in the actual rental transaction. The steps taken by [the

28    employer] did not constitute entrustment as the entrusting party was clearly the rental car

company.").

As the record is completely devoid of evidence to suggest an "entrustment" of the rental vehicle to Denny by CGL, "control" of the rental vehicle by CGL, or—most importantly—any facts to show that Denny <u>should not have been</u> entrusted to operate a rental vehicle, this claim fails as a matter of law, and CGL is entitled to summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, CGL respectfully requests that this Court find there are no genuine disputes of material fact and that CGL is entitled to summary judgment on all claims asserted against it by Plaintiff in Plaintiff's Second Amended Complaint, and dismiss this matter with prejudice as to CGL.

**FENNEMORE CRAIG, P.C.**

By: *  /s/  Wade Beavers*
SHANNON S. PIERCE (Nev. Bar No. 12471)
WADE BEAVERS (Nev. Bar No. 13451)
FENNEMORE CRAIG, P.C.
7800 Rancharrah Parkway
Reno, NV 89511

*Attorneys for Defendant Canonical Group Limited*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I certify that I am an employee of FENNEMORE CRAIG, P.C., and that on this date, pursuant to NRCP 5(b), I am serving a true and correct copy of the **CANONICAL GROUP LIMITED'S MOTION FOR SUMMARY JUDGMENT – PUBLIC REDACTED VERSION** on the parties set forth below by the Court's electronic filing / service system, with a courtesy copy sent via U.S. mail addressed to:

Ramzy P. Ladah, Esq.
Ladah Law Firm
517 South Third Street
Las Vegas, NV 89101
litigation@ladahlaw.com
*Attorneys for Plaintiff*

Gary R. Guelker, Esq.
Resnick & Louis, P.C.
8925 West Russell Road, Suite 220
Las Vegas, NV 89148
gguelker@rlattorneys.com
*Attorneys for Intervenor Allstate Insurance Company*

Robert P. Molina, Esq.
701 Bridger Avenue, Suite 600
Las Vegas, NV 89101
rmolina@pyattsilverstri.com
*Attorneys for Defendants Gordon Denny and Avis Car Rental*

Dated: December 15, 2023

_/s/ Debbie Sorensen_
An employee of Fennemore Craig, P.C.

1

## INDEX OF EXHIBITS

2

| Exhibit No. | Description |
|---|---|
| 1 | Affidavit of Katherine Ollerhead |
| 2 | Employment Contract (Confidential) |
| 3 | Relevant Excerpts of Gordon Denny 8/24/23 deposition transcript |
| 4 | Relevant Excerpts of Gordon Denny 10/15/23 deposition transcript |
| 5 | Expense report |
| 6 | Accident incident report |
| 7 | Canonical Group Limited's Objections to Plaintiff's Second RFAs to Gordon Denny |
| 8 | Relevant Excerpts of Trooper Black's deposition transcript |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28