# EXHIBIT 3

## REDACTED

**Excerpts of Gordon Denny 8/24/23 Deposition Transcript**

```
 1                    DISTRICT COURT

 2                 CLARK COUNTY, NEVADA

 3

 4

 5   RONALD CARPENTER, J., an      )
     individual,                   )
 6                                 )
                  Plaintiff,       )
 7                                 )
             vs.                   ) Case No.
 8                                 ) A20-815402
                                   )
 9   GORDON DENNY, an individual;  )
     PV HOLDING CORP. dba AVIS CAR )
10   RENTAL, a foreign corporation,)
     et al.,                       )
11                                 )
                  Defendants.      )
12   _____)
     ALLSTATE INSURANCE COMPANY,   )
13                                 )
                  Intervenor.      )
14   _____)

15

16

17      VIDEOCONFERENCE DEPOSITION OF GORDON DENNY

18              THURSDAY, AUGUST 24, 2023

19

20

21

22

23

24   REPORTED BY:  KATHERINE M. SILVA, CCR #203
     LST JOB NO:  1013384-A
25
```

```
 1              VIDEOCONFERENCE DEPOSITION OF GORDON

 2   DENNY, on THURSDAY, AUGUST 24, 2023 at 12:38

 3   p.m., before Katherine M. Silva, Certified Court

 4   Reporter, in and for the State of Nevada.

 5

 6   APPEARANCES:

 7   For the plaintiff:

 8                    LADAH LAW FIRM
                      BY:  ADRIAN KARIMI, ESQ.
 9                    517 South Third Street
                      Las Vegas, Nevada 89101
10
     For Canonical Group
11   Limited:

12                    FENNEMORE CRAIG, PC.
                      BY:  WADE BEAVERS, ESQ.
13                    7800 Rancharrah Parkway
                      Reno, Nevada 89511
14
     For Gordon Denny and
15   Avis Car Rental:

16                    PYATT SILVESTRI
                      BY:  ROBERT P. MOLINA, ESQ.
17                    701 Bridger Avenue
                      Suite 600
18                    Las Vegas, Nevada 89101

19   For Allstate Insurance
     Company:
20
                      RESNICK & LOUIS, P.C.
21                    BY:  GARY R. GUELKER, ESQ.
                      8925 West Russell Road
22                    Suite 220
                      Las Vegas, Nevada 89148
23

24

25
```

```
 1                    I   N   D   E   X

 2   Witness:  GORDON DENNY

 3   EXAMINATION                        PAGE

 4       BY:  Mr. Beaver               6, 121

 5            Mr. Karimi                 104

 6            Mr. Guelker               117

 7

 8

 9

10

11

12             E   X   H   I   B   I   T   S

13   NUMBER          DESCRIPTION              PAGE

14   Exhibit 1       Transcript                15

15   Exhibit 2       Employment contract       15

16   Exhibit 3       Expensify report          28

17   Exhibit 4       Expensify report          54

18   Exhibit 5       Accident report           63

19   Exhibit 6       Responses                 90

20

21

22

23

24

25
```

```
 1                THURSDAY, AUGUST 24, 2023

 2                     12:38 p.m.

 3                       -o0o-

 4                (The court reporter was relieved

 5                 of her duties under Rule

 6                 30(B)(A) of the Nevada Rules of

 7                 Civil Procedure.)

 8                (Agreement of Counsel to have

 9                 witness sworn in remotely.

10

11           THE VIDEOGRAPHER:  We are now on the

12  record.

13           Today's date is August 24th, 2023 and

14  the time is 12:38 p.m. Pacific Time.

15           This is the video deposition of Gordon

16  Denny in the matter of Ronald Carpenter, Jr.,

17  versus Gordon Denny, et al. filed in the District

18  Court, Clark County, Nevada.  Case number

19  A-20-815402-C.

20           This deposition is taking place via web

21  videoconference with all participants appearing

22  remotely.

23           My name is Ruperto Garcia representing

24  Litigation Services, a Veritext Company.

25           Would counsel on the conference please
```

```
 1   identify yourself and state whom you represent

 2   beginning with the question attorney.

 3          MR. BEAVERS:  This is Wade Beavers.

 4   I'm counsel for Canonical Group, Limited.

 5          MR. MOLINA:  This is Robert Molina.

 6   I'm counsel for Mr. Denny.

 7          MR. GUELKER:  This is Gary Guelker

 8   appearing for Allstate Insurance Company.

 9          MR. KARIMI:  This is Adrian Karimi for

10   plaintiff.

11          THE VIDEOGRAPHER:  Thank you, Counsel.

12          The court reporter today is Kathy Silva

13   representing Litigation Services, a Veritext

14   Company.

15          The court reporter will now swear in

16   the witness.

17   Whereupon --

18                  GORDON DENNY

19   having been first remotely sworn to testify to

20   the truth, whole truth, and nothing but the

21   truth, was examined and testified as follows:

22          THE VIDEOGRAPHER:  Counsel, please

23   proceed.

24   .   .   .

25   .   .   .
```

1      Q.    Business management you said?

2      A.    Yeah.

3      Q.    Do you have any training or education

4    in law or the legal field?

5      A.    No.

6      Q.    Do you have --

7            Never had any aspirations to be a

8    lawyer or barrister or attorney?

9      A.    No.

10     Q.    Okay.  Are you currently married?

11     A.    No.

12     Q.    Have you ever been married?

13     A.    No.

14     Q.    We talked about you were previously

15   employed by Canonical.

16           And do you remember the dates that you

17   were employed by Canonical, approximately?

18     A.    April 2018.

19     Q.    You started with Canonical in the

20   spring of 2018?

21     A.    Yeah.

22     Q.    And approximately when did your

23   employment with Canonical end, if you remember?

24     A.    2020 June, I think.  I can't remember

25   the specific day, but I think it was around









19

20

21

22

23

24

25

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19        Q.   So a lot of responsibilities.
20             I guess, would you characterize your
21   main role at the company is to locate and bring
22   in new employees to work for Canonical and its
23   affiliated companies?
24        A.   Well, yeah, being asked -- yeah, yeah.
25        Q.   Just broad view, finding people to come
```

1    work for Canonical and a lot of interaction with

2    potential candidates to come work for Canonical

3    and I think you mentioned part of that sometimes

4    would be going to events.

5              Could you tell me a little bit more

6    about that?

7        A.    Yeah, I went to numerous events where

8    sometimes we had a stall, sometimes we didn't

9    have a stall, but it was the same, speak to as

10   many people as possible, find out what they do,

11   exchange cards, tell them to come work for

12   Canonical.  Basically just trying to stir up

13   their interest, basically, of any kind.

14       Q.    Find people who are also attending the

15   event and see if they might be a good fit and see

16   if they might be a good candidate to work for

17   Canonical?

18       A.    Yeah.

19       Q.    So did you travel pretty frequently in

20   your role as a recruiter for Canonical?

21       A.    Yes.  Well, depends what you mean by

22   frequently but --

23       Q.    Yeah.

24             Well, I guess, just kind of describe

25   for us how often you would travel and the places

1    you would go, just everything you can remember

2    about your work travel?

3         A.    It was kind of on and off.  Sometimes I

4    traveled frequently and sometimes, like, I

5    wouldn't go for a few months.  I used to go to

6    the U.S. quite a bit.

7              The head office is in Austin -- or used

8    to be Austin, I don't know where it's at.  So I

9    used to go to Austin a fair amount.

10             I went to Orlando for an event.  I went

11   to, obviously, Vegas for an event.  I went to

12   Bratislava for -- to basically see if I can get

13   ahold of some external agencies out there, build

14   some relationships out there.  I went to --

15        Q.    I don't need to know every trip you

16   took because I might have a record but a lot of

17   it.

18             But, I guess, is it fair to say when

19   you travel for events for the purpose of

20   recruiting that the work that you do is pretty

21   much confined to being at the event and meeting

22   people at the event and finding candidates at the

23   event.

24             Is that fair to say?

25             (Off the written record.)

1          MR. MOLINA:  Object to the form of the

2     question.

3          MR. KARIMI:  Object to the form of the

4     question.

5          **Q.   (BY MR. BEAVERS)  Mr. Denny, so I guess**

6     **what I'm --**

7          **Just in general for the purposes of you**

8     **travelling to go to an event, is it fair to say**

9     **that the work that you would do as far as**

10    **recruiter's work when you travel on these trips**

11    **would be mainly confined to being at the event,**

12    **meeting people at the event, recruiting potential**

13    **candidates for Canonical at the event.**

14         **Is that fair to say?**

15         MR. MOLINA:  Objection to the form of

16    the question by Mr. Molina.

17         MR. KARIMI:  Join.

18         THE WITNESS:  I mean, my -- it didn't

19    just -- it wasn't just the events, no.  I was

20    asked to do a lot of work on my laptop.  So I

21    would do basically my day-to-day job as well.  So

22    I wasn't just at the events, I was working there.

23         **Q.   (BY MR. BEAVERS)  Okay.  And that would**

24    **be stuff that you do maybe in a hotel, you had**

25    **some emails to answer or something like that in**

1    **addition to being at the event, you still have**

2    **your other work that you need to keep up on?**

3    A.   Yeah, and actively recruiting.  So

4    actively recruiting.  I'm meeting people at the

5    event, I may be meeting them off the event.  I'm

6    basically just trying to drum up as much interest

7    as possible so that could be at the event or

8    after or also prior to the event.

9         Sometimes I meet up with candidates or

10   potential candidates before the event starts.  It

11   could be, like, prearranged or we'll meet up

12   after the event at some point.  So it weren't --

13   it weren't just the event and that's it, you

14   know.

15   **Q.   And as far as how your travel gets paid**

16   **for, it sounds like from reading this clause 5.4**

17   **that Canonical agreed that they would reimburse**

18   **you for expenses that you incur in or about the**

19   **performance of your duties.**

20        **Does that sound consistent with the way**

21   **your travel was covered when you worked at**

22   **Canonical?**

23   A.   Yes.

24   **Q.   So how would you get reimbursed for**

25   **expenses in connection with your travel, do you**

Page 24

1  recall?

2       A.   Well, mainly it's just I got reimbursed

3  for food and anything but basically anything I

4  had eaten or drank they would.

5            (Connectivity issues.)

6       **Q.   Canonical would cover?**

7       A.   I'm struggling to hear you.  Can you

8  repeat that again?

9       **Q.   Yes.**

10           **When you are travelling, Canonical will**

11  **cover some of your meals while you are travelling**

12  **and how do you document your meals when you are**

13  **travelling for Canonical?**

14      A.   I just normally keep my receipts, take

15  a picture of them, and when you get back to the

16  UK, you just basically put all the receipts

17  through the system for what is called Concord I

18  think it was or Concur.

19      **Q.   You submit them for reimbursement and**

20  **say these were expenses that I incurred while I**

21  **was working; correct?**

22      A.   Yeah, uh-huh, yes.

23      **Q.   Do you remember if there was guidelines**

24  **on the number of meals that you were able to**

25  **expense in a day?  Were, like, you restricted to**

1      A.    Yeah, I've never had that before.

2      **Q.    Okay.  Do you think you could have**

3   **submitted an expense that was completely**

4   **unconnected to your work that Canonical would not**

5   **have paid under this policy?**

6      A.    No.

7      **Q.    You think you could have submitted any**

8   **expense and they would have paid it?**

9      A.    Well, no.  If the expense made sense,

10  then they would pay it.  If it doesn't, then they

11  probably would not pay it.

12     **Q.    When would an expense not make sense**

13  **under this policy?**

14     A.    If I went out and bought got some

15  clothes or something.

16     **Q.    So a personal expense?**

17     A.    Yeah.

18     **Q.    Like football tickets, do you think you**

19  **could expense those if it was just you and your**

20  **buddies hanging out?**

21     A.    No.  Unless it was, like, I'm going

22  with a candidate or something.

23     **Q.    Yes, yes.  I do this a little bit, too,**

24  **I get how it works.**

25         **But there's a line where it's personal**

1      Q.    And at the bottom it says Expensify.

2            Do you know what this document is?

3      A.    I can't see it very well.  I'm guessing

4    it's my expenses.

5      Q.    I can zoom in if you'd like me to do,

6    just on this first part.

7            Is this a document you've ever seen

8    before?

9      A.    No.

10     Q.    Do you know what this --

11     A.    I mean I've never seen it in this form

12   but I'm guessing it's my expenses.

13     Q.    Sure.

14           Do you know what Expensify is?

15           Is that a website or a service?

16     A.    Yeah, that's the actual website we used

17   to book in our receipts from.

18     Q.    So you recall Canonical used Expensify

19   to track receipts for travel.

20           That sounds familiar to you?

21     A.    Yes.

22     Q.    And this could be a report that relates

23   to you.  It says Gordon Denny right here for a

24   trip to Austin in May of 2019.

25           Would that make sense?

1  my bag and save them all up until I get home and

2  then kind of take a picture of them.  Just

3  depends what I'm doing at that moment in time.

4      **Q.   Do you remember how it worked with**

5  **Canonical as far as booking your flights when you**

6  **would fly somewhere?**

7          **Do you remember how that works?**

8      A.   Yeah.  So -- well, my manager would get

9  approval, she would tell me to book my flights.

10  I booked them via a third party and I can't

11  remember what the company name is.  We used to

12  have to book all our flights through that

13  third-party company.

14     **Q.   Like a travel agency?**

15     A.   Yeah, but that's not the business,

16  travel agency.  So you are able to call them up

17  or go on their website.  Oh, no, I used to call

18  them up and basically tell them where I'm going.

19  They'll find me a flight and then they'll email

20  me the flight details and ask if that's okay and

21  I'll say yes or no and Canonical will pay for it.

22     **Q.   So you would actually take care of**

23  **booking directly with the travel agency yourself?**

24          **That wasn't something you had somebody**

25  **at Canonical do for you, you could make that call**

1    and you could tell them what you need?

2         A.   Yes.

3         Q.   And would you usually have some say

4    over what your dates of travel would be?

5              Is that something that you would pick

6    or is that something Canonical would tell you,

7    you are flying out on the 14th, you are coming

8    back on the 17th or would you have some exercise

9    or discretion as to what your travel dates were?

10        A.   No.   It's more up to Canonical the

11   majority of it were.   You know, they discussed

12   with me and I just try and find out what makes

13   the most sense.   Ultimately, it is their

14   decision.

15        Q.   So would you run your dates of travel

16   by Canonical before you called up the travel

17   agency and gave them the dates?

18             Would you work out with Erica or

19   whoever your supervisor was whatever your travel

20   dates would be?

21        A.   Yes.

22        Q.   And do you remember about --

23             Do you remember how Canonical would

24   handle your hotel stays?

25        A.   The same way.

 1      Q.   The travel agency booked the hotel?

 2      A.   We would book it together, flight and

 3 hotel.

 4      Q.   Okay.  All right.  I want to make sure

 5 before I move on --

 6           Well, I'd like to talk about the

 7 Las Vegas trip that's the subject of this lawsuit

 8 and you talked about it a little bit.

 9           Do you recall that the accident that we

10 are talking about, the trip that we are talking

11 about, occurred sometime at the end of November

12 2019?

13      A.   Yeah.

14      Q.   So I'm going to go back to your

15 transcript because I really want to make sure

16 that we are talking about the right dates when we

17 use dates here.

18           So I'm going to scroll down to page 15

19 of your transcript and here there's a question

20 and this was actually Mr. Karimi who works with

21 an attorney named Mr. Ladah and this would have

22 been Mr. Ladah asking these questions.

23           The question is:  Okay.  When did you

24 first arrive in Las Vegas?  The Friday beforehand

25 which I believe was the 28th of November 2019 or

1    was it the 29th?

2           The Friday before -- before the

3    collision.

4           Does this refresh your memory at all

5    about the dates that we are talking about?

6       A.   Yes.

7       Q.   And so what you were in town in Vegas

8    for?

9           What was the work aspect of your trip?

10      A.   There's an event going on in all the

11   hotels, the Mirage and whatever.  The event was

12   called AWS.

13      Q.   Is that Amazon Web Services?

14      A.   Correct.

15      Q.   Is that an event that happens every

16   year?

17      A.   I'm not sure if it happens every year,

18   but I think it was running for five years.  Yeah,

19   I think it was running 2015, 2016 but I think

20   they stopped it, but I'm not too sure.

21      Q.   What type of event is it?

22           What goes on at this event?

23      A.   Well, it's just like a load of --

24   there's, like, loads of classes that you can go

25   to so you can learn about different -- different

1  software packages that are coming out on Amazon

2  and different ways of instruction occurs.

3         So there's all different classes for --

4  to basically learn.  There was demos on certain

5  packages and how they work.  There was --

6         There was basically stalls there that

7  you could basically talk to people.  There was

8  loads of different, things like, hang-out spots

9  there.

10        But the main thing was it, basically,

11  was Amazon showing their products, basically, and

12  there are classes, various different classes that

13  they have there.

**14     Q.   And the event just attracts a lot of**

**15  people who might be good candidates to work at**

**16  Canonical, just a lot of people in the tech**

**17  industry there that you would want to talk to as**

**18  a recruiter?**

19      A.   Yeah.  Canonical uses AWS quite heavily

20  or it did, I'm not too sure about it now.  So

21  pretty much anyone in that event would probably

22  be relevant in some capacity to Canonical.

**23      Q.   And so if we are talking about maybe**

**24  you fly into Las Vegas on November 29th and then**

**25  there's this accident that occurs early of the**

1    morning of Saturday morning, November 30th, do

2    you remember what the dates of the conference

3    were based on that?

4         A.    It was a Monday through Friday, yeah.

5         Q.    Okay.  So maybe December -- we got the

6    30th, December 1st would be a Sunday.

7              So December 2nd, Monday, the conference

8    starts?

9         A.    I'm -- yeah.  Without having the dates

10   in front of me, yeah.

11        Q.    I actually --

12             I'm not going to mark this as an

13   exhibit, but can you see this calendar that I

14   have here?

15        A.    Yeah.

16        Q.    So I'll just represent to you that I

17   downloaded this from the Calendar 365.com website

18   just so we could kind of have something to look

19   at here.

20             It has November 2019 and it has Friday

21   the 29th, Saturday the 30th and Sunday the 1st.

22             Do you have any reason to doubt that

23   those are the days and the dates that we are

24   talking about here?

25        A.    No, that should be correct, yeah.

1      Q.   Okay.  So Monday, December 2nd is the

2   week the conference started?

3      A.   Yeah.

4      Q.   If you had made it to the conference on

5   time, if you had flown out on Sunday the 1st --

6           (Connectivity issues.)

7           MR. MOLINA:  Calls for speculation.

8           THE WITNESS:  Could I have made it on

9   time?

10      Q.   (BY MR. BEAVERS)  Yes.

11           Could you have attended the conference

12   if you had flown in from London on Sunday the

13   1st?

14      A.   I could have, but it would have been a

15   little rough.

16      Q.   Yeah, just a little rough getting in

17   that late.  It's a long flight from London.

18           Would it have been easier if you had

19   flown in on Saturday the 30th?

20           MR. MOLINA:  Objection, form of the

21   question.

22           MR. KARIMI:  Join, speculation.

23           THE WITNESS:  I'm sorry, what was the

24   question?  I didn't hear you clearly.

25      Q.   (BY MR. BEAVERS)  Yeah.  So we are

1    talking about getting you to the conference that

2    starts on Monday and flying in the day before

3    would have been rough.

4            Would it have been easier for you to

5    come in on Saturday the 30th to attend that

6    conference?

7        A.    Easier than the 1st?

8        Q.    Yes.

9        A.    It would have been easier than the 1st,

10   yeah.

11       Q.    Yeah.  And you could have made it to

12   conference on Monday flying in on Saturday the

13   30th?

14       A.    I could have, yeah.

15       Q.    So we talked a lot -- or I wasn't there

16   but Mr. Ladah asked you a lot of questions about

17   what you did in Vegas before the conference

18   started.

19            And we talked about a women named --

20   and please correct me if I'm mispronouncing --

21   Taje Williams.

22            Am I saying that right?

23       A.    Correct, yeah.

24       Q.    And I think I understand that

25   Ms. Williams was a friend of yours or maybe even

Page 44

1    somebody that you were even in a relationship

2    with; correct?

3        A.    Correct.  Well, no, it wasn't a

4    relationship.

5        Q.    A friends of yours, personal friend?

6        A.    Yeah.

7        Q.    Did Ms. Williams work for Canonical?

8        A.    No.

9        Q.    Has she ever worked for Canonical, to

10   your knowledge?

11       A.    No.

12       Q.    What type of work does Ms. Williams do,

13   if you know?

14       A.    I think she's a real estate agent.

15       Q.    And where does she live?

16       A.    In Austin.

17       Q.    Austin, Texas?

18       A.    Yes.

19       Q.    Did you ever try to recruit her to work

20   for Canonical?

21       A.    I did on one occasion.

22       Q.    And when was that?

23       A.    I don't remember the specific date of

24   when it was, but I did -- I did think she would

25   be a -- a decent pick for the STR team, the sales

1  event representative team.

2      Q.    And what made you think she would be a

3  good fit for Canonical?

4      A.    She's got sales experience.  Working

5  with the STR team you don't have to have too much

6  experience.  Basically, you just have to have the

7  personality to fit the role really and I felt she

8  had that.

9      Q.    Did you ever communicate to Canonical

10  that you thought that Ms. Williams would be a

11  good candidate to work for Canonical?

12      A.    Yeah, I believe I did.  She sent me a

13  C.V.  I don't remember if I sent it to anybody.

14  I don't remember.  I remember speaking with her

15  but I can't remember the exact date it was.

16      Q.    Do you remember about what year that

17  would have been?

18      A.    Probably the same year, 2019.

19      Q.    You think before this trip to Las Vegas

20  or after?

21      A.    Probably a bit before.

22      Q.    Okay.  Would you still have access to

23  that email, a copy of that email you are talking

24  about where she sent you her C.V.?

25      A.    I'm not sure.  I did clear out my

1    inbox.  Maybe.  I'm not too sure.

2         **Q.   Do you remember who you talked about**

3    **Ms. Williams at Canonical with?**

4              **Do you remember who you spoke to at**

5    **Canonical about Ms. Williams?**

6         A.   I think it was Erica.  It's just such a

7    long time ago I can't remember all the details,

8    but I think it might have been Erica I spoke to

9    her about.

10             I know one thing she didn't have was a

11   degree.  At some point -- at one point Canonical

12   basically said that nobody can be employed

13   without a degree.

14        **Q.   That's a rule that Canonical has is**

15   **that everyone who works there must have a**

16   **university or a college degree?**

17        A.   At one point, yeah.

18        **Q.   As a recruiter, was it your**

19   **understanding that you needed to recruit people**

20   **who had college degrees, university degrees?**

21        A.   At one point, yeah.

22        **Q.   What do you mean by at one point?**

23        A.   It wasn't always like that.  It

24   changed.

25        **Q.   Were you ever asked to recruit people**

1    who did not have college degrees?

2         A.    Not specifically that they don't have

3    college degrees, but they are open to having

4    people without college degrees.  They had

5    changed.  They were still -- it was still

6    recruiting some people who didn't have college

7    degrees because they were really good at the job

8    but for the vast majority they would all get

9    rejected if they didn't have college degrees.

10        Q.    And Ms. Williams, did she have any

11   experience in working in the technology sector at

12   all?

13        A.    Not in the technology sector, no.

14        Q.    For the most part, to your knowledge,

15   was she working in real estate or any other areas

16   she might have been working in?

17        A.    Sorry, what was that?

18        Q.    Do you know if she worked in any other

19   industry besides real estate, to your knowledge?

20        A.    Yeah, she worked in a hotel, she had

21   done some hotel work as a concierge and then she

22   went into real estate after that.

23        Q.    Mr. Denny, I thought I understood from

24   your first deposition that you were in a

25   relationship with Ms. Williams.

1              Could you clarify the nature of your

2   relationship with Ms. Williams?

3        A.   We were seeing each other, but we

4   weren't together.  It wasn't in a relationship.

5        Q.   What do you mean by seeing each other?

6        A.   As in, like, dating.

7        Q.   It was a romantic relationship, dating,

8   but maybe not formal --

9        A.   We weren't together, no.  We weren't

10  together.  We was dating so it wasn't a

11  relationship.

12       Q.   But it was romantic?  It wasn't

13  platonic?

14            Do you understand what I mean if I use

15  those words?

16       A.   Yeah, yes.

17       Q.   Okay.  Was it common for you to recruit

18  people for Canonical that you were in romantic

19  relationships with?

20       A.   No.

21       Q.   Had you ever done that?

22       A.   No.

23       Q.   Is there a reason why you would not

24  have done that?

25       A.   No.

Page 49

1      Q.    You just didn't?

2            Didn't date people who would be good

3    candidates in general or just something about

4    that would have been improper?

5      A.    I mean, if I was seeing somebody and

6    they were a good fit for a particular role at

7    Canonical, I wouldn't tell them they that they

8    can't join just because I'm seeing them.  So

9    sometimes work relationships happen quite

10   frequently, Canonical included.

11           Unless there's -- probably would be

12   dating, you know, three or four people at

13   Canonical at the same time or something like that

14   but, yeah, I mean, if I was dating someone and,

15   you know, they were good for a particular role, I

16   wouldn't tell them that they can't join just

17   simply because I'm dating them.

18     Q.    Did you testify in your first

19   deposition that you also have family in

20   Las Vegas?

21     A.    Yes.

22     Q.    And who lives in Las Vegas that you are

23   related to?

24     A.    I have an uncle, and -- no, sorry, I

25   have two uncles, an auntie -- sorry, strike that,

 1  please.

 2          I have two older cousins.  I call them

 3  my uncles but they are actually my dad's cousins

 4  and I've actually just known them as my uncles.

 5  I have an older female cousin.  I have three

 6  cousins that are around about my age, probably a

 7  bit younger than me and I have my older cousins,

 8  my dad's cousins, and their mother, that would be

 9  my -- I don't know what would make her to me,

10  auntie.

11      **Q.    So you have a good bit of family living**

12  **in Las Vegas it sounds like?**

13      A.    Yeah.

14      **Q.    Had you ever been to Las Vegas before**

15  **this trip in November 2019?**

16      A.    Yes, I believe so in 2018.

17      **Q.    Would that have been for work or would**

18  **that have been to visit family or both?**

19      A.    It was AWS.  AWS conference again.

20      **Q.    Same conference?**

21      A.    Same conference, yeah.

22      **Q.    Do you remember if you saw any family**

23  **in Vegas when you travelled out that first time**

24  **in 2018?**

25      A.    Yes.

1      Q.    And did you see any of your family when
2   you travelled out in 2019?

3      A.    Yes.

4      Q.    And I know you just went through a lot
5   of cousins.

6            Do you remember which ones you visited
7   when you were out in 2019?

8      A.    Well, I mean, that's pretty much all of
9   them.  They are all, kind of, like sons and
10  daughters and fathers and like saw each other
11  sort of thing.

12           So, kind of, like one where my cousin,
13  my older cousin which is my auntie, I guess, and
14  my older female cousin, she still lives with her
15  brother and my younger female cousin she used to
16  live with them as well with her son as well.  And
17  then my -- I have an older uncle I had, he lived
18  not too far away from them and then two younger
19  male cousins, they live close by as well.  So
20  they weren't too far away from each other.

21     Q.    When looking at this calendar here, do
22  you remember what dates you saw your family when
23  you were out here in Vegas?

24     A.    I think I saw them when I came into
25  Vegas because my uncle met me at the airport.

Page 52

```
 1   Yeah, at the airport.
 2       Q.    Do you remember if you saw him on that
 3   Saturday, on the 30th?
 4       A.    On the Saturday?
 5       Q.    Or on Sunday the 1st?
 6             Did you see him that weekend before the
 7   conference started.
 8       A.    I see him -- I saw him on the Sunday, I
 9   remember that.  Also them on the Sunday, I
10   remember that.  I saw him again once maybe during
11   the week as well.
12       Q.    When you got together on that Sunday,
13   do you remember what you guys did?
14       A.    Just had some dinner.
15       Q.    Some dinner?
16       A.    Correct, yeah.
17       Q.    Did any of your family members work for
18   Canonical?
19       A.    No.
20       Q.    Have you ever recruited any of them to
21   work for Canonical?
22       A.    No.
23       Q.    Now, tell me if you can, about the
24   flight from London to Vegas.
25             Do you remember about what time of day
```

Page 53

1  you would have left London on a plane?

2      A.   I don't recall.

3      Q.   How long is that flight, do you

4  remember?

5      A.   I don't recall.  I'm not too sure if

6  it's a direct flight.

7      Q.   Do you have any recollection about what

8  time of day it was when you got into Vegas that

9  Friday; early afternoon, evening?

10     A.   Honestly, I don't recall it, it's such

11  a long time ago.

12     Q.   But your uncle met you at the airport?

13     A.   Yeah.

14     Q.   And Ms. Williams, you said she lives in

15  Austin but she was in Vegas.

16          Did she come to Vegas to see you?

17     A.   Yeah.  She said that she was going to

18  Las Vegas and she found out I was going so she

19  came over.

20     Q.   Do you know when she arrived in Vegas?

21     A.   The same day, I believe.

22     Q.   She didn't go to the Amazon conference

23  at all; right?

24     A.   No, no.  She went and kind of did her

25  own thing.

Page 54

1        Q.    Do you know what she was doing during

2   the day while you were at the conference?

3        A.    Just going out for meals and, you know,

4   just going out to casinos or something like that.

5   I mean, I wasn't keeping tabs on that so she

6   could have done anything.

7        Q.    When you guys would go on dates, do you

8   remember who would usually pay for the meal or

9   would you guys split it?

10       A.    Sometimes she would pay.  Sometimes we

11  would split, sometimes I'd pay.  It varied.

12       Q.    Yeah, just kind of back and forth?

13       A.    Yeah.

14

15

16

17

18            CONFIDENTIAL PORTION

19

20

21

22

23

24

25

Page 54

1

2

3

4

5

6

7

8

9

10

11

12

13

14          MR. BEAVERS:  So I'm going to put up

15   another exhibit here and, Ms. Court Reporter, can

16   I have this marked as Exhibit 4.

17          And this is another confidential

18   document so I'll ask that this part of the

19   transcript still be confidential.

20          (Exhibit 4 marked.)

21     Q.   (BY MR. BEAVERS) But, Mr. Denny, do you

22   see --

23          Sorry, did somebody talk?

24          Mr. Denny, so do you see down here it

25   says Expensify again and up here it says November

Page 55

1    29, 2019 to December 9, 2019.

2            Do you see that?

3        A.    Yeah.

4        Q.    And does this look like another

5    Expensify report that Canonical would have kept

6    of travel expenses for you?

7        A.    Yeah.

8        Q.    Do you know who Matt Ellis is?

9        A.    Yeah, he ended up being my manager

10   after Erica.

11       Q.    So did Erica leave the company or

12   something and then Matt became your supervisor

13   after Erica?

14       A.    Yeah -- no, she's still with the

15   company -- well, she was still with the company

16   and she got sided into the HR world and Matt --

17   we basically broke off into different teams.

18   She's part of HR and he's part of recruitment.

19       Q.    Just scroll through the document.  It's

20   a bit longer than the other one.

21            Do you see copies of receipts?  And

22   this looks like an Uber receipt and I'll just ask

23   you aside from the receipts, have you ever seen

24   this document before that I'm on now, this

25   Expensify report.

1          Have you ever seen this document?

2     A.    I haven't seen it in that form, no,

3  but --

4     Q.    Do you remember submitting expenses --

5          So these dates, November 29th to

6  December 9th, 2019, does that sound like the

7  dates of your trip to Vegas that we've been

8  talking about?

9     A.    Yes.

10     Q.    Do you remember submitting expenses for

11  reimbursement in connection with that trip?

12     A.    I don't remember specifically doing

13  that, no, but, yes, I did reimburse, yeah.

14     Q.    Well, I guess, does this document

15  refresh your recollection that you submitted

16  expenses for that trip?

17          Does this document jog your memory at

18  all about whether you did or didn't?

19     A.    Well, yeah, I definitely submitted some

20  expenses, yeah.

21     Q.    And so this one here where it has meals

22  and it has a total and it goes down, travel

23  accommodation, travel airlines, even travel car

24  hire, travel taxi fares.  A lot of different

25  categories of expenses here.

1             And so let's just look at taxis.

2    November 29, December 9, December 9.

3             Is it your understanding that this is a

4    complete list of all the expenses that you

5    submitted for that trip that maybe characterizes

6    as taxi or ride-share expenses?

7         A.   I can't actually see it.

8         Q.   I'll zoom in a little bit.

9             But, I guess, is that the purpose of

10   the total here?  That's the total of the called

11   taxi fares that you expensed for this particular

12   trip?

13        A.   Yes, I guess so.

14        Q.   And car hire, this seems like -- it

15   says parking at the MGM $15.

16             So this would have been total parking

17   expenses that you submitted for reimbursement for

18   this trip?

19        A.   Yes.

20        Q.   And then airline seating, it looks like

21   upgraded for package, 65 pounds.  The Palms

22   Casino.

23             Is that where you stayed on this trip,

24   The Palms?

25        A.   Yeah, yeah.

1    we talked about that you flew in from London.

2             Do you recall what Spuntino is?

3      A.   No, I don't.

4      Q.   Okay.  Do you have any reason to doubt

5    that this is a complete list of all the meals

6    that you submitted for reimbursement for that

7    trip?

8      A.   Do I have any doubt?

9      Q.   Yes.

10            Any reason to think that's not true

11   that this isn't the complete list?

12      A.   I mean, on some occasions I did

13  misplace receipts and stuff like that.  So it may

14  not be the complete list.

15      Q.   It may not be the complete list of

16  meals that you ate, but as far as the Expensify

17  report that got prepared, do you have any reason

18  to doubt that this is all the ones that made it

19  into the report?

20      A.   Oh, right, right.  No, it shouldn't be,

21  no.

22      Q.   Right.

23            Because that's how this works is it

24  keeps track of all the ones you put under a meal

25  reimbursement; right?

```
 1        A.    Yeah.
 2        Q.    And so I will go down to there, 181 it
 3   says down here.  It says Spuntino, Heathrow T3
 4   Airside, November 29th, 2019.
 5              Do you see this?
 6        A.    Yes.
 7        Q.    And Heathrow, is that the London
 8   airport?
 9        A.    Yeah.
10        Q.    Is this a restaurant at the London
11   airport, from what you remember?
12        A.    I'm guessing so.
13        Q.    You don't remember this particular
14   restaurant?
15        A.    I don't remember it.  I'm not disputing
16   that I went there, but I just don't specifically
17   remember.
18        Q.    Yes, they are all kind of the same at
19   airports.
20              It says 13:49.  I interpret that as the
21   time.
22              Does that read as the time to you?
23        A.    Is that the reason what?  Sorry.
24        Q.    Yes.  Do you read this being a time,
25   13:49, a date and a time?
```

```
 1        A.    Oh, yes, yes.

 2        Q.    And I think that's military time.  I

 3   guess, some cash registers are set on this.

 4              But I read that as being about 1:49

 5   p.m.  That's what time it is where I am.

 6              Is that how you read that 13:49 as 1:49

 7   in the afternoon?

 8        A.    Yeah.

 9        Q.    So it's already after lunchtime and

10   this is a meal.

11              Do you have any reason to doubt that

12   this is a meal that you ate?

13        A.    No.

14        Q.    Okay.  So there's a marvelous zinger

15   burger and there's a drink and this would have

16   been a little bit after lunchtime.

17              Does this refresh your recollection

18   about when you flew out of London that day?

19        A.    No, still doesn't.

20

21

22

23

24

25
```

Page 61

```
 1
 2
 3
 4
 5              CONFIDENTIAL PORTION
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19      Q.   Well, it looks like you were still in
20  London in the afternoon so you would have gotten
21  on the plane probably after this, after you ate
22  lunch; correct?
23      A.   Right.
24      Q.   Yeah.
25           So you might have gotten into Vegas
```

1          But I do want to get a good sense of

2     the time that the accident occurred and get a

3     sense of what happened before that accident

4     occurred and what you were doing after you flew

5     in from London.

6          And so I'm just going to show one more

7     exhibit here.  I'm going to ask that this be

8     marked as Exhibit 5 and I think you may have seen

9     this document before.

10          (Exhibit 5 marked.)

11     Q.   (BY MR. BEAVERS) Do you see this here

12     where someone has wrote Gordon Denny?

13     A.   Yep.

14     Q.   Is this a document that you wrote?

15     A.   Yep.

16     Q.   So the only reason I got this document

17     is because I want to talk about a specific date

18     and time.

19          So 11/30/2019, 4:30 a.m. is that -- and

20     I think you testified to this last time.

21          But is that your recollection of the

22     time that this accident -- about what time the

23     accident occurred that's the subject of this

24     lawsuit?

25     A.   In all honestly, I can't actually

Page 64

1    remember what time the accident was.

2        Q.   Do you think it was not 4:30 a.m. on

3    November 30th?

4        A.   I don't have any reason to doubt it,

5    no.

6        Q.   And I think also in your first

7    deposition we were kind of using that as the

8    time.

9            It seems to makes sense to me.  You fly

10   in late November 29th.  November 30th is a

11   Saturday, we talked about looking through the

12   calendar.

13           So this would have been early in the

14   morning the day after you flew in to Vegas.

15           Does that sound fair?

16   A.   Yeah.

17       Q.   Yeah.

18           And so -- and I'll just go back to your

19   transcript the first time, just looking back at

20   Exhibit 1, and we'll go down to page 27 and

21   this -- there's a lot of questions about this but

22   this is one that I think kind of frames up where

23   we are.

24           Page 27, line 2:

25               Okay.  Where were you

Page 65

```
 1                    heading when the collision

 2                    occurred?

 3                    Back to my hotel.

 4                    Back to your hotel from

 5                    where?

 6                    We went to go pick up

 7                    some food.  I can't actually

 8                    remember the fast food

 9                    place that we went to but,

10                    yes, we went to pick up

11                    some food, basically, to

12                    take to the hotel.

13                    Was there anyone in the car

14                    with you?

15                    Yes.

16                    Who?

17                    The young lady I was seeing,

18                    Taje Williams.

19              Do you recall this testimony?

20         A.   Yes.

21         Q.   Do you still think that that's accurate

22    as you sit here today?

23              Is that your recollection?

24         A.   Yes.

25         Q.   Do you have any better memory today as
```

Page 68

1           And do you still not have a good memory

2    of what else you did or what else you and

3    Ms. Williams did that night before the accident

4    or can you remember more as you sit here today?

5        A.   No, no.

6        Q.   When you say you left the hotel, you

7    left The Palms, was Ms. Williams staying at The

8    Palms with you?

9        A.   Yeah, she was staying with me.

10       Q.   So you guys left together to get food,

11   that's your memory?

12       A.   Yeah.

13       Q.   And about how long before the accident

14   would that have been, do you recall?

15       A.   I don't recall.  I can't remember.

16       Q.   From what you remember, you guys went

17   out, you picked up some fast food and then you

18   came back and you can't remember doing anything

19   else?

20       A.   All I remember is going out, picking up

21   some food.  I can't remember anything else apart

22   from the accident at that point.

23       Q.   Any recollection about how long that

24   would have taken you to leave the hotel and get

25   food?

1      Q.   Do you remember anything about the

2  concert?  I've never been.

3      A.   Yeah, I remember it was a good concert,

4  I was impressed.  I always wanted to see Mariah

5  Carey and it was a Christmas concert.

6      Q.   Yeah.

7          How did you get the tickets, do you

8  remember?

9      A.   I'm not sure.  I'm think Taje, she may

10  have bought them.  I'm not sure.  I can't

11  remember if I'm honest.

12      Q.   You think you would have been able to

13  buy those tickets for the two of you and expense

14  them for Canonical?

15          Do you think Canonical would have

16  reimbursed you for those tickets if you bought

17  them?

18      A.   No.

19      Q.   Why not?

20      A.   Because it's not a reasonable expense.

21      Q.   Because it was too expensive?

22      A.   No, it's not a reasonable expense.

23      Q.   Not reasonably related to your work for

24  Canonical?

25      A.   Well, it's a complete different -- as I

1    said before, if I was going to invite a client or

2    a candidate then maybe, but if I was just going

3    to go and enjoy a concert I wouldn't expense it.

4

5

6

7

8                  CONFIDENTIAL PORTION

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4      Q.   Okay.  So going back to this Exhibit 4,

5   we went through the list of meal expenses and I

6   think we said this is probably a complete list of

7   what got submitted to Expensify as far as meals.

8           And you don't really remember the

9   burger at Spuntino.

10          Do you remember any other meals that

11   you had on November 29th of 2019 as you sit here

12   today?

13      A.   No, not really, no.

14      Q.   Okay.  The next one I'm going to ask

15   about this one on November 30th, 2019, Joyful

16   House.

17          So I'll scroll down to a receipt down

18   here on page 82 and this one is kind of faint so

19   I'll zoom in.

20          Do you see this receipt?  It says

21   Joyful House at the top?

22      A.   Yep.

23      Q.   It says in 11/30/2019 which I think we

24   talked about is the day of the accident and the

25   time is 00:24.

1          **Are you able to tell what kind of**
2  **restaurant this is from look at this receipt?**
3      A.   I'm guessing that is meant to be fried
4  rice.  That must be some sort of Chinese or Asian
5  thing.
6      **Q.   Sure.**
7           **And so this receipt appears in this**
8  **report because it's a receipt that you would have**
9  **submitted to Expensify in connection with your**
10 **Vegas trip; correct?**
11     A.   Yeah.
12     **Q.   Do you have any reason to doubt the**
13 **accuracy of anything that's on this receipt?**
14     A.   No.
15     **Q.   Do you specifically remember submitting**
16 **this receipt?**
17     A.   No.
18     **Q.   Do you remember this meal at all?**
19     A.   I can't say that I remember it, no, but
20 four years ago.
21     **Q.   But this would have been a little over**
22 **three hours before the accident you left the**
23 **restaurant.**
24          **You don't remember this meal at all?**
25     A.   Maybe if I have a look at what the

Page 74

```
 1   restaurant looks like I might be able to jog my
 2   memory but not just from a receipt.
 3       Q.   Yeah.  I wish we were at that
 4   restaurant.  I've actually been there.  It's
 5   pretty good.
 6       A.   Yeah.  I mean, I don't have any reason
 7   not to believe it's mine because I submitted it.
 8   I just can't specifically remember it.
 9       Q.   And are you able to tell from looking
10   at this receipt that you were with somebody when
11   you ate this meal or if you ate it by yourself?
12       A.   May have been with Taje from the
13   receipt.
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2

3

4

5                    CONFIDENTIAL PORTION

6

7

8

9

10

11

12

13

14        Q.    I guess, let me ask you this.

15              When you fly into Vegas and your uncle

16   picks you up from the airport, did your uncle

17   take you somewhere after that?

18        A.    Sorry?

19        Q.    Yeah, I heard something but I'm not

20   sure that was anybody.

21        A.    Okay.  Yeah, no, he didn't -- he didn't

22   pick me up from the airport.  He just met me

23   there.

24        Q.    And you got a rental car at some point;

25   right?

1      A.   Yeah, I'm pretty sure I was at the

2   airport for the rental car unless I'm mistaken,

3   but I'm pretty sure I was at the airport.

4      **Q.   Do you remember when you met up with**

5   **Ms. Williams that night?**

6      A.   I can't remember what time she flew in,

7   no.

8      **Q.   Do you remember if you met her at the**

9   **hotel or somewhere else?**

10     A.   No.  I think she got an Uber to the

11   hotel.

12     **Q.   Do you remember doing anything by**

13   **yourself that night like going out to dinner.**

14     A.   I can't remember that.

15     **Q.   Okay.  But looking at this, we've got**

16   **orange chicken -- it looks like two items of**

17   **orange chicken, we've got fried rice, looks like**

18   **one cabernet, two chardonnays.**

19          **Does this like it could have been a**

20   **receipt for a meal with you and Taje?**

21     A.   I mean, she probably been with us.   I

22   mean probably was.

23     **Q.   Was there anybody else you could have**

24   **been eating dinner with at that time of that**

25   **night?**

1      A.    Not at that time of night, no.

2      **Q.    What do you and Ms. Williams usually**

3   **talk about when you were on dates?  I know you**

4   **talk about a lot.**

5          **But did you guys have common interests**

6   **or do you both like travel or you talk a lot**

7   **about your family?**

8          **Do you remember what a typical date for**

9   **you guys would have been like?**

10     A.    I mean, we both enjoy sports.  We spoke

11  a lot about our work.  Me being ambitious, her

12  being ambitious as well.  We spoke a lot about

13  what we want to do in the future and talked about

14  music, she's into it, and that's why we went to

15  the Mariah Carey concert.  Just general things

16  really.

17     **Q.    But you don't have any memory of this**

18  **meal or whether she was with you or not so you**

19  **don't remember anything you would have talked**

20  **about if she was there with you at this meal;**

21  **correct?**

22     A.    No.

23     **Q.    Does this seem like --**

24          **Looking at the receipt, these glasses**

25  **of wine, the orange chicken, would you describe**

1    Lake Side?

2            Did you collect any receipts between

3    here and there that you remember submitting to

4    Canonical for reimbursement?

5            As you sit here today, do you remember

6    anything like that?

7        A.   I don't remember submitting a receipt,

8    no.

9        Q.   Do you remember if you actually got

10   reimbursed for all of these expenses that you

11   submitted?

12       A.   I assume so.

13       Q.   You don't remember any of them being

14   rejected?

15       A.   No, not unless I was -- didn't realize.

16       Q.   Did you do any shopping while you were

17   in Vegas?

18       A.   No.  I think we went to one shopping

19   outlet.  I think it was near the Trump Towers,

20   Donald Trump is on the top.

21            Just went to -- Taje went to get a

22   jacket.  It was a bit cold and she didn't bring

23   any jackets with her so she went to go and get

24   one but I didn't do shopping myself, no.

25       Q.   You didn't buy any clothes?

1    A.    No.

2    Q.    Did you buy clothes for Ms. Williams or

3    did she buy them herself?

4    A.    No, she bought them herself.

5    Q.    Would you have told Ms. Williams that

6    you could submit her receipts to Canonical for

7    reimbursement?

8    A.    No.

9    Q.    And you don't remember the exact date

10    of that Mariah Carey concert, but do you have any

11    recollection of whether it would have been the

12    weekend before the conference or would you have

13    gone during the week of the conference?

14    A.    It probably was on the weekend; I just

15    can't remember what specific date it was.

16    Q.    You don't remember if it was before the

17    conference or after the conference?

18    A.    No, it was probably before the

19    conference.  Probably before the conference.  I

20    can probably look it up on the Internet.

21    Q.    Boy, I'll tell you, I tried to find

22    specific Mariah Carey dates for that weekend and

23    I couldn't.  So I don't know that we'll do that

24    now, but I would be curious if you remember later

25    and want to tell Mr. Molina.

1    time and they wouldn't have had any say to what

2    you did on your personal time?

3            MR. MOLINA:  Object to the form of the

4    question.

5            THE WITNESS:  Can you -- can you say

6    that again, please?

7        Q.   (BY MR. BEAVERS)  I guess just explain

8    to me why wouldn't you -- why do you feel you

9    wouldn't need Canonical's permission to go a

10   Mariah Carey concert in Las Vegas?

11       A.   Because it's just, you know -- I mean,

12   I don't know why I would need permission.

13           (Connectivity issues.)

14       Q.   Did you do any recruiting for Canonical

15   at the Mariah Carey concert, meet any new

16   candidates?

17       A.   No, but I mean, Canonical haven't ever

18   said that you can't go anywhere.  You can only go

19   to your hotel room.  If you are going to go to an

20   event you have to go back.  They haven't said

21   anything like that.

22       Q.   And is that because when you travel you

23   do get some personal time to yourself even though

24   you travelled for Canonical, some of that time

25   that you have you can go pursue your own personal

1    things without getting Canonical's permission?

2         A.   Yes.

3         Q.   Back to this calendar.  I forgot to

4    ask.

5              Why didn't you fly in on Friday the

6    29th?

7              We talked about how you could have made

8    it on time for the conference if you flew in the

9    30th, but why the 29th?

10             Is that a date that you picked?

11        A.   No, Erica picked it.  She thought I

12   needed a bit of time to adjust to the changing

13   time.  So she often picked a couple days before.

14        Q.   And as we talked about, it's kind of

15   expected that you can spend some personal time.

16             If you have down time, you are

17   permitted to do that without Canonical's

18   permission?

19        A.   Yeah, I'm not restricted on where I go.

20        Q.   Okay.  So I'm going to go back to your

21   transcript and just walk you through a last

22   couple of things and this is -- these are

23   questions that Mr. Ladah asked you and I just

24   want to make sure we are getting your best

25   testimony on this stuff.

```
 1                   And we've got on 33 or page 33 of
 2      Exhibit 1.  Mr. Ladah asked you:
 3                        We've already established
 4                        that you were here in Vegas
 5                        on official company business
 6                        for Canonical; correct?
 7                        Yeah.
 8                   And he asked:
 9                        If it wasn't for Canonical,
10                        you wouldn't have been here
11                        in Vegas; correct?
12                        Correct.
13                        Okay.  Do you know what
14                        within the course and scope
15                        of your employment means?
16                   Then you ask:
17                        The course and scope of
18                        my employment?
19                   To the extent the course and scope of
20      your employment is a legal term, is it fair to
21      say that's not a term you are familiar with as
22      it's used in a lawsuit context?
23                   MR. MOLINA:  Objection, form of the
24      question.
25                   THE WITNESS:  Can you rephrase that
```

Page 86

1   question for me, please?

2        Q.   (BY MR. BEAVERS)  Yes.

3             I think we talked about how you are not

4   a lawyer, you are not a barrister, you are not an

5   attorney.  You testified you that don't have any

6   legal training.

7             Are you --

8             Do you have a lot of familiarity with

9   legal terms and their use in civil litigation in

10  the United States?

11       A.   No, obviously not.

12       Q.   And so to the extent the course and

13  scope of your employment has a meaning to me as

14  US lawyer in a civil lawsuit, that's probably not

15  the same meaning that it would have for you?

16            You wouldn't be familiar with it the

17  same way I am.

18            Is that fair to say?

19            MR. MOLINA:  Objection, form of the

20  question.

21            THE WITNESS:  Can you rephrase that,

22  please?

23       Q.   (BY MR. BEAVERS)  Yes.  I guess I'm

24  just trying to get you to agree with me.  I think

25  it's true.  You don't use -- well, let me ask it

```
 1   in a different way.
 2          So when Mr. Ladah used the term course
 3   and scope of your employment and you asked course
 4   and scope my employment, was that a phrase that
 5   you had heard before and had a lot of familiarity
 6   with?
 7       A.   I wouldn't say I heard it before, no.
 8       Q.   Never used it in the context of a legal
 9   proceeding or had it explained to you in the
10   context of a legal proceeding?
11       A.   No.
12       Q.   Okay.  So Mr. Ladah explains in his own
13   words he explains to you:  Yeah.  In other words,
14   everything you were doing here in Las Vegas was
15   on behalf of Canonical; correct?
16          And you said:  Yes.
17          Do you remember that testimony?
18       A.   Yes.
19       Q.   But I think as we talked about, if we
20   could just refine it a little bit more, not
21   everything you did in Las Vegas was for Canonical
22   because you did some things that were personal
23   for you that you didn't ask for Canonical's
24   permission for; correct?
25          MR. GUELKER:  Object as to form and
```

1    this is Gary.

2              MR. MOLINA:  And join, this is Rob

3    Molina.

4              THE WITNESS:  Can I go ahead?

5         **Q.   (BY MR. BEAVERS)  Yes, please.**

6         A.   Yeah.  I mean, I guess so.  There

7    wasn't -- like with -- when you are away on a

8    trip you don't -- you know, it's not just

9    confined to the event.  You know, there's down

10   time, personal time, that you can do that.  You

11   can do -- go sight-seeing or whatever, but I was

12   in Vegas because I was with Canonical.

13        **Q.   But we talked about that.  There was**

14   **some of that down time.  You weren't on call**

15   **24/7, you did do some things personal for you**

16   **without getting Canonical's permission.**

17              **We talked about a few things; right?**

18        A.   Yes.

19        **Q.   Okay.  Did you do any sight-seeing?**

20        A.   I mean, we saw some of the hotels and

21   stuff, yeah.  I mean, I was on the Strip quite a

22   bit anyway because of the event.  So after the

23   event sometimes I walked down the Strip and look

24   at some of the hotels.

25        **Q.   Did you go to any shows besides Mariah**

Page 89

1   **Carey?**

2          A.   There was one show I went to -- no,

3   that was -- that was in 2018.  No, I don't

4   think -- I don't think so.

5          **Q.   Can you think of any way that you going**

6   **to the Mariah Carey concert benefited Canonical?**

7          A.   No.

8          **Q.   Can you think of any way that you and**

9   **Ms. Williams going shopping at the outlets by the**

10  **Trump Tower, did that shopping that you guys were**

11  **doing benefit Canonical in any way?**

12         A.   No.

13         **Q.   To the extent you were going out to get**

14  **fast food from the hotel before the accident,**

15  **would that have benefited Canonical in any way?**

16               MR. MOLINA:  Objection, form of the

17  question.

18               THE WITNESS:  Can you re-explain that,

19  please?

20               MR. BEAVERS:  Ms. Court Reporter, can

21  you read that back.

22               (Record read back.)

23               THE WITNESS:  Well, they have a -- I

24  wouldn't say it benefits them per se, but in that

25  they tell you you are able to go out and get some

```
 1    food.  So that was -- yeah, I mean, that's their
 2    policy you can go and get food.
 3              I mean, if they didn't feed me when I
 4    was over there, I probably wouldn't have been
 5    over there.
 6        Q.   (BY MR. BEAVERS)  Okay.  Is there any
 7    way other than getting food that benefits
 8    Canonical?
 9        A.   Not that I know of, no.
10        Q.   So I'm going to show you one more
11    document here and I'm almost done, I promise.  I
12    thank you for staying up with me.
13        A.   No problem.
14              MR. BEAVERS:  And I ask that this
15    document be marked as Exhibit 6.
16              (Exhibit 6 marked.)
17        Q.   (BY MR. BEAVERS)  And do you see here
18    it says United States District Court, District of
19    Nevada and down here it says defendant Gordon
20    Denny's responses to the second set of request
21    for admissions.
22              Do you see that?
23        A.   Yeah.
24        Q.   Have you ever seen this document
25    before?
```

1  that night with Ms. Williams after you flew in?

2      A.   I don't believe so.  I can't recall

3  specifically, but I'm not entirely sure.

4      Q.   I'm back on Exhibit 1, your transcript,

5  page 31 when Mr. Ladah asks:  Okay.  Now, had you

6  drank at all that day, the day of the collision?

7          You said:  No.

8          Mr. Ladah asked:  You said you went

9  down and you played some, you gambling a little

10 bit during the day before the crash occurred; is

11 that correct?

12         Does that refresh your memory that you

13 did a little bit of gaming --

14     A.   I may have, but I just can't remember.

15 If I'm saying I did that, it was probably a bit

16 fresher in my memory then.  I did -- I did do

17 some gambling when I was there.  I'm not a

18 massive gambler or anything like that but I did

19 go on some of the tables, yeah.

20     Q.   And no reason to change your testimony

21 now that you did some gambling that night?

22     A.   Sorry?

23     Q.   No reason to change your testimony now

24 that you did some gambling that night before the

25 accident?

Page 96

1       A.    Not really.

2       Q.    **About how much money would you usually**

3   **gamble when you go out?**

4             **What kind of games would you play?**

5       A.    I played the slot machine.  Maybe won

6   about 100 bucks and I cashed out.  Played

7   blackjack on the blackjack table.  I think I

8   might have won about 70 bucks and that was about

9   it.  I think I might have lost all in all about

10  50 bucks, that's it.

11      Q.    **It sounds like you were up for a little**

12  **bit?**

13      A.    Yeah, it's gone up and down.

14      Q.    **Did you ever give any of your gambling**

15  **winnings to Canonical?**

16      A.    No.

17      Q.    **Did you ever submit any your ATM**

18  **receipts to Canonical for reimbursement for money**

19  **you lost gambling?**

20      A.    No.

21      Q.    **Would Canonical let you submit receipts**

22  **for reimbursement just for drinks?**

23            **Like, if there was no food and you got**

24  **a cocktail, would Canonical have reimbursed that?**

25      A.    Yes.

1           So that was your supervisor at

2     Canonical; correct?

3        A.    Correct, yeah.

4        Q.    So not only was Canonical aware that

5     you were going to be in Vegas the weekend before

6     the convention, it actually made a decision to

7     send you there the weekend beforehand; correct?

8        A.    Correct, yeah.

9        Q.    Okay.  And I think you said --

10           Well, let me just ask you again.

11           Do you have any understanding of why

12     she sent you the Friday before?

13        A.    She used to always send all the

14     recruiters a few days before just to try to get

15     climatized with the time differences.

16        Q.    Right.  That's what I thought you said

17     before.

18           So what time --

19           It's an eight-hour time difference

20     between Las Vegas and London; correct?

21        A.    Correct, yeah.

22        Q.    So it's your understanding that one of

23     the reasons was you were there was to help

24     acclimate to the new time zone and help with the

25     jet lag.

1      A.    Yeah, they paid for my meals and my

2    hotel.

3      **Q.    All right.**

4      A.    Sorry, am I missing something here?

5      **Q.    No, no, no.  You are fine.  I'm just**

6    **trying to create a record, sir.**

7           **And did Canonical ever tell you that**

8    **you are expected to stay in your room 24 hours a**

9    **day during that weekend before the -- before the**

10   **convention?**

11     A.    No.

12           MR. GUELKER:  That's all I have.

13           Thanks.

14           MR. MOLINA:  This is Robert Molina for

15   Mr. Denny.  I have no questions.

16                   EXAMINATION

17   BY MR. BEAVERS:

18     **Q.    Mr. Denny, so I get to just follow up a**

19   **little bit on what the other attorneys said and**

20   **real quick to follow up on something that**

21   **Mr. Guelker asked you.**

22           **So we talked about part of your job as**

23   **a recruiter, you know, appearing rested, being**

24   **professional, being a good face for the company,**

25   **those things were important to you and you spoke**

Page 122

1    to in your recruiting job, I think that was your

2    testimony.

3        A.    Yes.

4        Q.    All right.  So would it have been your

5    practice to get a good night's sleep before you

6    were going to go into a day of work to go out and

7    start recruiting?

8              Is that part of your preparation for

9    getting ready for a busy day is to get a good

10   night's sleep?

11       A.    Yeah, it would have been to get a good

12   night's sleep.

13       Q.    Okay.  Because you don't want to look

14   like you were up at 5:00 in the morning in Vegas

15   while you are out recruiting; correct?

16             MR. GUELKER:  Objection, form of the

17   question, argumentative.

18             THE WITNESS:  Well, I wouldn't want to

19   be really, really tired at the conference, no.

20       Q.    (BY MR. BEAVERS: )  So I'll just ask.

21             We talked about Friday you fly in, you

22   are in late, get dinner and Chinese food, go back

23   to the hotel, go back and get some fast food, get

24   in this accident at 4:30 in the morning, on

25   Saturday, early Saturday morning.

Page 123

1          Did you have any intention when you

2     were having this date night with Ms. Williams of

3     doing any recruiting the next day?

4          MR. GUELKER:  Objection, form of the

5     question.

6          THE WITNESS:  Did I have any intention

7     of doing recruitment.  This is Sunday; right?

8     Q.   (BY MR. BEAVERS: )  This would have

9     just been Saturday, it was early morning

10    Saturday.

11          But Saturday or Sunday, were you

12    planning any recruiting activities on any of

13    those days?

14    A.   No, I wouldn't say I was planning

15    anything per se.

16          MR. BEAVERS:  Okay.  I don't have any

17    further questions, Mr. Denny.

18          I really appreciate your time.

19          THE WITNESS:  Okay.  Thank you.

20          THE VIDEOGRAPHER:  Before we go off the

21    record, Madam Reporter, do you have a questions?

22          THE COURT REPORTER:  No, I Just need to

23    know who wants a copy.

24          MR. MOLINA:  This is Robert Molina for

25    Mr. Denny.  We'll handle sign and review and I'll

Page 125

1                   CERTIFICATE OF REPORTER

2    STATE OF NEVADA       )
                           )SS
3    COUNTY OF CLARK       )

4        I, Katherine M. Silva, a certified court

5    reporter, Clark County, State of Nevada, do

6    hereby certify: That I reported remotely the

7    deposition of the witness, GORDON DENNY,

8    commencing on TUESDAY, AUGUST 24, 2023, at 12:38

9    p.m.

10       That prior to being examined the witness was

11   by me duly sworn to testify to the truth. That I

12   thereafter transcribed my said shorthand notes into

13   typewriting and that the typewritten transcript

14   of said deposition is a complete, true and

15   accurate transcription of said shorthand notes.

16       I further certify that I am not a relative

17   or employee of an attorney or counsel of any of

18   the parties, nor a relative or employee of an

19   attorney or counsel involved in said action, nor

20   a person financially interested in the action.

21       IN WITNESS WHEREOF, I have hereunto set my

22   hand in my office in the County of Clark, State of

23   Nevada, this 29th day of August, 2023.

24

25   _____
     Katherine M. Silva, CCR #203