# EXHIBIT 4

**Excerpts of Gordon Denny 10/15/23 Deposition Transcript**

Gordon Denny                                          Ronald Carpenter, Jr. v. Gordon Denny, et al.

Page 1

```
 1                    DISTRICT COURT

 2               CLARK COUNTY, NEVADA

 3   RONALD CARPENTER, JR.,      )
     an individual;             )
 4                              ) CASE NO.:
               Plaintiff,       ) A-20-815402-C
 5                              )
     vs.                        )
 6                              )
     GORDON DENNY, an            )
 7   individual; PV HOLDING     )
     CORP. dba AVIS CAR          )
 8   RENTAL, a foreign          )
     corporation; DOES I        )
 9   through V, inclusive;      )
     and ROE CORPORATIONS I     )
10   through V, inclusive,      )
                                )
11             Defendants.      )

12

13

14

15        VIDEOTAPED DEPOSITION OF GORDON DENNY

16               Via Videoconference

17         Taken on Friday, October 15, 2021

18                  At 8:13 a.m.

19          By a Certified Court Reporter

20                   Remotely in

21               Las Vegas, Nevada

22

23

24    Reported By:  Karen L. Jones, CCR NO. 694
      Job No.:  44365
25
```

www.oasisreporting.com                                          702-476-4500

Gordon Denny                                    Ronald Carpenter, Jr. v. Gordon Denny, et al.

2

```
1   APPEARANCES:
2   For the Plaintiff:
3           LADAH LAW FIRM
              BY:  RAMZY PAUL LADAH, ESQ.
4           517 S. Third Street
              Las Vegas, Nevada  89101
5           702.252.0055
              litigation@ladahlaw.com
6
7   For the Defendant:
8           PYATT SILVESTRI
              BY:  ROBERT P. MOLINA, ESQ.
9           701 Bridger Avenue, Suite 600
              Las Vegas, Nevada  89101
10          702.838.6000
              rmolina@pyattsilvestri.com
11
12  For Intervenor:
13          RESNICK & LOUIS, P.C.
              BY:  GARY GUELKER, ESQ.
14          222 Main Street, 5th Floor
              Las Vegas, Nevada  89148
15          801.960.3655
              gguelker@rlattorneys.com
16
17
18
    Also Present:  Joseph Camp, Videographer
19
20
21
22
23
24
25
```

3

```
1                   I N D E X
2   WITNESS:  GORDON DENNY
3   EXAMINATION                          PAGE
4     BY: Mr. Ladah                        5
5
6
7

                  E X H I B I T S
8
    NUMBER           DESCRIPTION          PAGE
9
    Exhibit 1  Statement                   54
10
    Exhibit 2  Copies of Photographs       76
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
1              P R O C E E D I N G S
2                  * * * * *
3
4        THE VIDEOGRAPHER:  Good morning.  Today
5   is October 15th, 2021.  We are on the record at
6   approximately 8:13 a.m. Pacific Standard Time.  This
7   begins the recorded videoconference deposition of
8   Gordon Denny in the matter of Ronald Carpenter,
9   Junior, an individual, Plaintiff, versus Gordon
10  Denny, an individual, et al., Defendants, Allstate
11  Insurance Company, Intervener.
12       My name is Joseph Camp, court
13  videographer with Las Vegas Legal Video, and your
14  court reporter is Karen Jones with Oasis Reporting
15  Services.
16       This deposition is noticed by attorneys
17  for plaintiff.  Counsel must agree to the remote
18  manner by which this proceeding is being
19  transcribed.
20       Would counsel please state your
21  appearances and consent to the remote arrangement
22  for the record and then the court reporter will
23  administer the oath.
24       MR. LADAH:  Ramzy Ladah for plaintiff.
25  Agreed.  No objection.
```

5

```
1        MR. MOLINA:  Robert Molina for the
2   defendants.  No objection.
3        MR. GUELKER:  Gary Guelker for
4   intervening Defendant Allstate Insurance Company.
5   No objection.
6
7   Whereupon,
8            GORDON DENNY,
9   having been first duly sworn to testify to the
10  truth, the whole truth and nothing but the truth,
11  was examined and testified as follows:
12            EXAMINATION
13  BY MR. LADAH:
14  Q.     Please state and spell your name for the
15  record.
16  A.     Gordon Denny.  D-E- -- sorry.  Gordon
17  spelled G-O-R-D-O-N.  Denny spelled D-E-N-N-Y.
18  Q.     Do you prefer I refer to you as
19  Mr. Denny?
20  A.     Either/or.
21       THE REPORTER:  I'm sorry?
22  BY MR. LADAH:
23  Q.     I'm sorry?
24  A.     Either/or.
25  Q.     Either/or.  Okay.
```



Gordon Denny                                    Ronald Carpenter, Jr. v. Gordon Denny, et al.

10

1        THE VIDEOGRAPHER:  The time is 8:20 a.m.
2   We are going off the record.
3        (A recess is taken.)
4        THE VIDEOGRAPHER:  The time is
5   approximately 8:30 a.m. Pacific Standard Time.  We
6   are back on the record.
7   BY MR. LADAH:
8    Q.    Mr. Denny, I was just going over the
9   ground rules.  Another ground rule is if you want to
10  take a break, we can take a break.  I just want you
11  to make sure you finish answering the question
12  that's pending so we don't take a break in the
13  middle of a pending question.  Does that make sense?
14   A.    Yes.
15   Q.    Is there any reason why I can't get your
16  best testimony today?
17   A.    No.
18   Q.    Have you ingested any drugs or alcohol
19  in the last 24 hours that would impede your ability
20  to give your best testimony today?
21   A.    No.
22   Q.    Okay.  Where do you live?
23   A.    I'm have no fixed about, but my -- my
24  sort of mail address is at my mom's house.  Flat 2,
25  33 St. Albans Place.

11

1        THE REPORTER:  I'm so sorry to
2   interrupt.  That's Flat 2?
3        THE WITNESS:  Flat 2, 33 St. Albans
4   Place.
5        THE REPORTER:  Could you spell that,
6   please?
7        THE WITNESS:  St., S-T.  Then Albans,
8   A-L-B-A-N-S, Place.
9        THE REPORTER:  Thank you.
10  BY MR. LADAH:
11   Q.    And if you could try to -- Mr. Denny, if
12  you could try to make sure you talk slowly.  We're
13  having a little trouble understanding your accent
14  over here.
15   A.    Oh, sorry.  Yeah.
16   Q.    That's okay.  Thank you.
17        Where were you born?  Take us through
18  your background.
19   A.    In the U.K., in London.
20   Q.    Okay.  And have you lived there
21  continuously ever since?
22   A.    Yes.
23   Q.    Okay.  And how old are you?  What's your
24  date of birth?
25   A.    My date of birth is the 6th of the 9th,

12

1   1985.  I'm 36 years old.
2        (Reporter clarification.)
3        THE WITNESS:  September 6th, basically.
4   BY MR. LADAH:
5    Q.    September 6th, 1985, is your birthday?
6    A.    Yeah.
7    Q.    Okay.  And when did you first get your
8   driver's license?
9    A.    September 21st, 2010.  I'm not
10  100 percent on the exact date, but it was
11  September 2010.
12   Q.    Have you ever held a commercial driver's
13  license?
14   A.    I don't know what commercial driver's
15  license is.
16   Q.    It's a driver's license to drive like a
17  big rig or a truck heavy truck?
18   A.    Oh, no, no.
19   Q.    Okay.  And has your license to drive
20  ever been suspended or revoked?
21   A.    No.
22   Q.    I want to go over motor vehicle
23  collisions you've been involved in since you first
24  obtained your driver's license.
25        Can you take me through how many motor

13

1   vehicle collisions you've been involved in since you
2   first obtained your driver's license?
3    A.    One.
4    Q.    What was the date of that one?
5    A.    2018.  December 2018, I think, which is
6   an estimate.
7    Q.    Okay.  And when you say one, you're
8   saying one in addition to the one we're here to talk
9   about today; is that correct?
10   A.    Oh, yes.  Two.
11   Q.    So the motor vehicle collision you were
12  involved in in December of 2018, where did that
13  collision occur?
14   A.    In Austin, Texas.
15   Q.    And were you cited for that collision?
16   A.    No.
17   Q.    Was the other driver cited?
18   A.    No.  Cited means prosecuted, right?
19   Q.    Given a citation, like a ticket.
20   A.    Oh, no.
21   Q.    You were not given a ticket?
22   A.    No.
23   Q.    Were you not at fault for that
24  collision?
25   A.    No.



Gordon Denny                                    Ronald Carpenter, Jr. v. Gordon Denny, et al.

14

1    Q.    You agree you were not at fault for that
2  collision; is that what you're saying?
3    A.    I wasn't at fault for that collision,
4  no.
5    Q.    What were you doing in Austin, Texas?
6    A.    I was visiting a -- an office from my
7  workplace, so I was working at a company and they
8  sent me over.
9    Q.    And what's your profession.
10   A.    Recruiter.
11   Q.    Recruiter for?
12   A.    For technology, in the technology space.
13   Q.    For technology, you said?
14   A.    Yeah.
15        (Reporter clarification.)
16        THE WITNESS:  Are you asking for the
17  company I'm working for or the type of recruitment I
18  do?
19  BY MR. LADAH:
20   Q.    We didn't hear what you said.  You said
21  something technology.
22   A.    No.  I'm saying within the technology
23  space.  So I recruit within the technology space.
24   Q.    What company do you work for?
25   A.    At the moment, I don't work at any

15

1  company.  At the time, I was working for a company
2  called Canonical.
3        THE REPORTER:  Could you spell that,
4  please?
5        THE WITNESS:  C-A-N-O-N-I-C-A-L.
6  BY MR. LADAH:
7    Q.    Over the last ten years, have you
8  visited the United States regularly?
9    A.    There was a period I did visit
10  regularly, yes.
11   Q.    What was the period?
12   A.    Between 2000 and -- 2018 to 2019.
13   Q.    And why did you visit the United States
14  regularly between 2018 and 2019?
15   A.    It was basically because of work
16  purposes.
17   Q.    Okay.  For your recruiting for the
18  technology company?
19   A.    Yes.
20   Q.    Is that what you were in Las Vegas for
21  when the subject collision occurred?
22   A.    Yes.
23   Q.    Okay.  When did you first arrive in
24  Las Vegas?
25   A.    The Friday beforehand, which I believe

16

1  was the 28th of November 2019.  Or was it the 29th?
2  The Friday before -- before the collision.
3    Q.    The collision -- my records show the
4  collision occurred 11/30 of 2019.  Is that what you
5  have, as well?  Did you hear me?
6    A.    Sorry.  Talking to me?
7    Q.    Yes.
8    A.    Oh, sorry.  Yes, I believe so.
9    Q.    11/30 of 2019 would have been, looks
10  like a Saturday.  Would that be correct?
11   A.    Yes.
12   Q.    And that's the date the collision that
13  we're here to talk about today occurred?
14   A.    Yes.
15   Q.    Okay.  And you're saying you would have
16  arrived in Las Vegas on the 29th?
17   A.    Yeah, the day before.
18   Q.    Which would have been a Friday?
19   A.    Yeah.
20   Q.    Okay.  And you were here for work
21  purposes?
22   A.    Yeah.
23   Q.    Okay.  And tell us what company you were
24  working for at the time again?
25   A.    The same company, Canonical.

17

1    Q.    Can you give me -- is Canonical a U.K.
2  company?  A U.S. company?  What is it?
3    A.    They're a U.K. company, but they're --
4  they've got offices across the globe.
5    Q.    Do they have offices in Las Vegas?
6    A.    No.
7    Q.    Do they have offices in United States?
8    A.    Yes.
9    Q.    When the collision occurred, were you
10  within the course and scope of your employment with
11  Canonical?
12        MR. MOLINA:  Objection.  Vague and
13  ambiguous.  Calls for a legal conclusion.
14        THE WITNESS:  Can you clarify that
15  question, please?
16  BY MR. LADAH:
17   Q.    You were in Las Vegas to recruit for
18  Canonical; is that correct?
19   A.    Yes.
20   Q.    Okay.
21   A.    Well, yes, and to attend an event.
22   Q.    What event?
23   A.    The AWS event.
24   Q.    Say that again.  I'm sorry.
25   A.    AWS event.  Amazon Web Services event.

Gordon Denny                                      Ronald Carpenter, Jr. v. Gordon Denny, et al.

22

1  you arrive on the 29th?
2     A.    Arrived on the 29th.  Went straight
3  to -- well, actually, checked out the airport.  Went
4  to Avis to collect the car.
5        From Avis, I drove down to the hotel I
6  was staying at, which was Palms.  And my uncle
7  called me just to make sure that I landed safely.
8  He lives in Vegas as well.
9        It's a bit of a blur as to what happened
10 next.  I was waiting for a lady that I was seeing at
11 the time.  She was flying over from Austin.  I went
12 to -- did I pick her up?  Yeah, I think I went back
13 to the airport to pick her up.  And we both came
14 back to the hotel.
15    Q.    That's the 29th?
16    A.    29th, yeah.
17    Q.    Okay.  So the flight here to Las Vegas,
18 did you fly directly from the U.K.?
19    A.    Yes, I believe so.  I don't think there
20 was any stops.  I believe it was a straight flight.
21    Q.    And that flight was paid for by
22 Canonical; is that correct?
23    A.    Correct, yeah.
24    Q.    Okay.  Your hotel room was also paid for
25 by Canonical, right, you said?

23

1     A.    Correct.
2     Q.    Now, did you attend any events on the
3  29th?
4     A.    No.
5     Q.    When did the event start, Amazon Web
6  Services?
7     A.    I believe it was Mon-- -- either Sunday
8  or Monday.  I think it might have been a Monday it
9  started.
10    Q.    Did you -- were you -- did you already
11 start recruiting?  You said part of your job for
12 Canonical was recruiting employees.  Had you been --
13 you said you had been here recruiting also in
14 addition to attending Amazon Web Services, the
15 event.  Tell us -- go ahead.
16    A.    Well, that's how we do recruit.  So
17 we'll go to an event to recruit.  So we speak to
18 people at our desk and see if anyone's interested
19 essentially.
20    Q.    I understand.  So the recruiting is done
21 at the conference?
22    A.    Yes.
23    Q.    Okay.  And you believe the conference
24 started on a Monday?
25    A.    I believe so.

24

1     Q.    Okay.  The next day, Saturday, take us
2  through your day, what did you do?
3     A.    Woke in my hotel room, had some
4  breakfast.  The -- I was with the young lady I was
5  seeing pretty much all day.
6        I think we -- oh, we went -- I think we
7  went to a spa that day that wasn't too far away from
8  the hotel.
9        I can't remember what the spa was
10 called.  She just basically took me as a surprise.
11 I got a massage.  Came back to the hotel.  Came back
12 to the hotel.  I think we spent some time in the
13 hotel.  Went out.  I think we went downstairs into
14 the casino area and played some games.
15       I think I might have lost about $40 and
16 I stopped.
17       I'm struggling to remember the precise
18 events, what happened on that specific day.
19    Q.    Did you drink at all that day?
20    A.    No.
21    Q.    Do you drink?
22    A.    I do, but I'm not a heavy drinker.
23    Q.    Did you drink at all the night before?
24    A.    No.
25    Q.    You didn't drink at all the night of the

25

1  18th?
2     A.    Sorry?
3     Q.    You didn't drink at all the night of the
4  18th?
5     A.    The 28th, you mean?
6     Q.    Sorry.  We're on the -- I'm sorry.  The
7  29th.  I apologize.  The 29th.
8     A.    Yeah, no.
9     Q.    Okay.  Roughly what time did the
10 collision that we're here to talk about today occur?
11    A.    I'm not sure of the time.
12    Q.    Okay.  Were you jet lagged at all?
13       (Crosstalk.)
14       THE REPORTER:  I'm sorry.  I didn't get
15 the answer or the objection.
16       MR. MOLINA:  The objection is vague and
17 ambiguous.
18 BY MR. LADAH:
19    Q.    Go ahead.
20    A.    Are you able to clarify?
21    Q.    Any time I fly overseas, you know,
22 there's a time change so I'm jet lagged.
23       Were you jet lagged?
24    A.    Maybe a little bit.  I wasn't tired at
25 the time.  But I had just come over from the U.K. so

Gordon Denny                                                     Ronald Carpenter, Jr. v. Gordon Denny, et al.

26

1  I was running probably on a slightly different
2  clock.
3      Q.    When the collision occurred, are you
4  saying you were not jet -- you were not tired?
5      A.    No.
6      Q.    You weren't sleepy at all?
7      A.    No.
8      Q.    But you were distracted, it sounds like?
9      A.    No.
10     Q.    You were not distracted at all?
11     A.    No.  We had -- I had a conversation in
12  the car, but I wouldn't say that was a distraction.
13     Q.    The conversation did not distract you?
14     A.    No.
15     Q.    Okay.  It didn't distract your attention
16  from the roadway ahead of you?
17     A.    Like maybe a second, but it wasn't any
18  abnormal distraction.
19     Q.    Okay.  You took your eyes off the road,
20  though, didn't you?
21     A.    At what point are you saying that I took
22  my eyes off the road?
23     Q.    Right before the collision occurred, you
24  took your eyes off the road, didn't you?
25     A.    No.  No.  Well, before the collision

27

1  occurred, yes, but not right before.
2      Q.    Okay.  Where were you heading when the
3  collision occurred?
4      A.    Back to my hotel.
5      Q.    Okay.  Back to your hotel from where?
6      A.    We went to go pick up some food.  I
7  can't actually remember the fast food place that we
8  went to.  But, yeah, so we went to pick up some food
9  basically to take to the hotel.
10     Q.    Was there anyone in the car with you?
11     A.    Yes.
12     Q.    Who?
13     A.    The young lady that I was seeing, Taje
14  Williams.
15     Q.    And are you still seeing Taje Williams?
16     A.    No.
17     Q.    Okay.  Are you still in touch with her?
18     A.    No.
19     Q.    Do you have her phone number?
20     A.    Yes.
21     Q.    Can you give that to us, please?
22     A.    I did have Taje's number, but this is a
23  new phone.  I actually got it last week, and it
24  doesn't appear that it's transferred over.
25     Q.    Do you have your old phone?

28

1      A.    No.
2      Q.    Did you throw it away?
3      A.    No.  We -- we -- it's an old phone, yes,
4  but it's been wiped clean.
5      Q.    So who wiped it clean?
6      A.    Me.
7      Q.    Why did you wipe it clean?
8      A.    Once I -- once I've transferred all my
9  information to this phone, I wiped that one clean in
10  preparation of trying to basically sell it.
11     Q.    Why did her phone number not transfer
12  when everyone else did?
13     A.    I have no idea.  And not everything's
14  transferred either.  I just noticed my pictures
15  haven't been transferred either.  So not
16  everything's been transferred.
17     Q.    Are you saying there's no way to get
18  that information off your old phone?
19     A.    Not the old phone.  I can probably get
20  it for you, but you just have to give me a day or
21  two to get it.
22     Q.    Okay.  So if we send over an
23  interrogatory, a written question, you'll be able to
24  give us the phone number?
25     A.    A what?  Sorry?

29

1      Q.    If we send over a written question in
2  writing of what her phone number is, you'll be able
3  to get us that information?
4      A.    I should be, yeah.  I should be able to
5  get it, yeah.
6      Q.    And Taje Williams was in the car when
7  the crash occurred, correct?
8      A.    Correct, yeah.
9      Q.    So you were coming from the place you
10  got food from; is that correct?
11     A.    Yes.
12     Q.    And did you eat in or dine in or did you
13  get food to take back to the hotel?
14     A.    No, we got food to bring back to the
15  hotel.
16     Q.    So the food was in the car with you?
17     A.    Yeah.
18     Q.    And do you know the name of the place
19  you got the food from?
20     A.    I can't remember if I'm completely
21  honest.
22     Q.    Did you pay with cash or credit?
23     A.    I wouldn't be able to give you a -- I
24  wouldn't be able to give you a positive answer.
25     Q.    The reason I ask is because if you pay



Gordon Denny                                    Ronald Carpenter, Jr. v. Gordon Denny, et al.

30

1  with credit, you could look at your credit card
2  statement and find the name of the facility or
3  the -- sorry, the establishment that you purchased
4  the food from.  Does that make sense?
5      A.    Uh-huh.  Yes, that makes sense.
6      Q.    Are you willing to do that if we send
7  over a request, to look at your credit card
8  statement to see if you can find the establishment,
9  the name of the establishment that you purchased the
10 food from?
11     A.    Yes.
12     Q.    Okay.  Going back to -- is it "Taje" or
13 "Taj" Williams?
14     A.    Taje.
15     Q.    Taje.  Taje, did Taje live in Austin?
16     A.    Yes.
17     Q.    When did you stop seeing Taje?
18     A.    Shortly after I came back from that trip
19 in Vegas.
20     Q.    Okay.  And how long had you been seeing
21 her before the trip to Vegas?
22     A.    Just literally that year.
23     Q.    When you say shortly after the trip
24 ended, are you talking about a week?  A month?
25     A.    No more than a month.

31

1      Q.    Okay.  Now, had you drank at all that
2  day when the -- the day of collision?
3      A.    No.
4      Q.    You said you went down and you played
5  some -- you gambled a little bit during the day
6  before the crash occurred on the -- on the 30th.
7  I'm sorry; is that correct?
8      A.    Yes.
9      Q.    You don't drink when you're gambling?
10     A.    No.  I'm not a big drinker.
11     Q.    Okay.  How far was this establishment
12 where you got the food from the hotel, from the
13 Palms?
14     A.    I wouldn't be able to answer that
15 positively.  It's been a while.
16     Q.    Give me an estimate of how long you
17 drove when you left the Palms and went to this
18 establishment to get the food, how long was the
19 drive?
20     A.    Right.  Well, I -- I -- I'm not even too
21 sure I came from the Palms to get the food.  But we
22 were going back from the restaurant to -- to the
23 Palms.  Like I said, I can't remember the exact
24 events of that day.  But I remember us going to get
25 some food and going back to the hotel.

32

1          I can't remember immediately what we
2  were doing before that.  But if I was to estimate,
3  I'd probably say 15, 20 minutes max.
4      Q.    Well, as you sit here today, you can't
5  remember where else you would have gone that day
6  before the collision occurred?
7      A.    No, because we -- we done a -- we done a
8  few things that we went to, you know, go and see.
9  Mariah Carey in concert.  But it's hazy in terms of
10 what days we done things.
11     Q.    You're saying it's all blending
12 together?
13     A.    Pretty much in terms of the actual
14 events that we done.
15     Q.    Let me ask you this.  I want to ask
16 about how good your recollection of the actual
17 collision and the ten minutes leading up to the
18 collision is.  On a scale from zero to 10, zero
19 being no recollection whatsoever, 10 being crystal
20 clear, the best recollection you could possibly have
21 of an event.  How would you rank your recollection
22 of the actual collision with my client and the ten
23 minutes leading up to that collision?
24     A.    That's -- that's two questions in one.
25 I would say the actual event itself in terms of the

33

1  collision, I'd say my -- you know, it's only a few
2  seconds so my recollection is pretty clear, so 9 or
3  10.
4          Before the collision probably a bit
5  hazy, because, like I said, I can't really remember
6  exactly what I was doing.  What I remember is going
7  to pick up some takeout and driving back home.  But
8  in terms of roads and that sort of stuff that we
9  turned on, I wouldn't be able to tell you.
10     Q.    We've already established that you were
11 here in Vegas on official company business for
12 Canonical, correct?
13     A.    Yeah.
14     Q.    If it wasn't for Canonical, you wouldn't
15 have been here in Vegas, correct?
16     A.    Correct.
17     Q.    Okay.  Do you know what within the
18 course and scope of your employment means?
19     A.    The course and scope of my employment?
20     Q.    Yeah.  In other words, everything you
21 were doing here in Las Vegas was on behalf of
22 Canonical, correct?
23     A.    Yes.
24     Q.    Okay.  Now, let's go through the
25 collision.  Tell me in your own words how the



Gordon Denny                                   Ronald Carpenter, Jr. v. Gordon Denny, et al.

---

**82**

1  that way.
2       THE VIDEOGRAPHER:  Any copy of the
3  video, Mr. Molina?
4       MR. MOLINA:  Yes, please.
5       THE VIDEOGRAPHER:  Would you like that
6  synced with the transcript?
7       MR. MOLINA:  Yes, please.
8       THE VIDEOGRAPHER:  Okay.  Karen, do you
9  need anything?
10      THE REPORTER:  I don't believe so.
11  Thank you.
12  BY MR. LADAH:
13   Q.    Wait.  Let me ask one last question,
14  Mr. Denny.  Do you accept responsibility for this
15  crash?
16      MR. MOLINA:  Objection.  Vague and
17  ambiguous.
18  BY MR. LADAH:
19   Q.    Go ahead.
20   A.    Can you clarify that question for me,
21  please?
22   Q.    Do you accept responsibility for this
23  crash?
24      MR. MOLINA:  Calls for a legal
25  conclusion.

---

**83**

1       THE REPORTER:  And I didn't get an
2  answer.
3  BY MR. LADAH:
4   Q.    Do you accept responsibility for this
5  crash?
6       MR. MOLINA:  Objection.  Calls for a
7  legal conclusion and vague and ambiguous.
8       THE WITNESS:  No, I wasn't the one
9  responsible for the crash occurring.
10      MR. LADAH:  Thank you.  That's it.
11      THE VIDEOGRAPHER:  This concludes the
12  recorded videoconference deposition of Gordon Denny
13  on October 15th, 2021.
14      The original media from today's
15  testimony will remain in the custody of Las Vegas
16  Legal Video.  The time is 10:15 -- excuse me, 10:18
17  Pacific Standard Time.
18      We are going off the record.
19      (Exhibits 1 and 2 marked.)
20
21
22      (The deposition concluded at 10:18 a.m.)
23           -oOo-
24
25

---

**84**

1              CERTIFICATE OF DEPONENT
2  PAGE   LINE   CHANGE              REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14            *    *    *    *    *
15      I, GORDON DENNY, deponent herein, do hereby
    certify and declare the within and foregoing
16  transcription to be my deposition in said action;
    that I have read, corrected and do hereby affix my
17  signature to said deposition under penalty of
    perjury.
18            _____
              GORDON DENNY, Deponent
19
20
21
22
23
24
25

---

**85**

1              CERTIFICATE OF REPORTER
2
   STATE OF NEVADA  )
3                   )SS:
   COUNTY OF CLARK  )
4
5      I, Karen L. Jones, a duly commissioned and
   licensed Court Reporter, Clark County, State of
6  Nevada, do hereby certify:  That I reported the
   taking of the deposition of the witness, GORDON
7  DENNY, commencing on Friday, October 15, 2021 at
   8:13 a.m.
8
9      That prior to being examined, the witness was,
   by me, duly sworn to testify to the truth.  That I
10 thereafter transcribed my said shorthand notes into
   typewriting and that the typewritten transcript of
11 said deposition is a complete, true and accurate
   transcription of said shorthand notes.
12
13     I further certify that (1) I am not a relative
   or employee of an attorney or counsel of any of the
14 parties, nor a relative or employee of an attorney
   or counsel involved in said action, nor a person
15 financially interested in the action; nor do I have
   any other relationship with any of the parties or
16 with counsel of any of the parties involved in the
   action that may reasonably cause my impartiality to
17 be questioned; and (2) that transcript review
   pursuant to NRCP 30(e) was requested.
18
19
20     IN WITNESS HEREOF, I have hereunto set my
   hand, in my office, in the County of Clark, State of
21 Nevada, this 1st day of November, 2021.
22
23           KAREN L. JONES, CCR NO. 694
24
25

---